UNITED STATES of America, Appellee,

v.

Donald E. JACOBS, Defendant–Appellant.

No. 796, Docket 96–1341.

United States Court of Appeals,
Second Circuit.

Argued Jan. 10, 1997.

Decided July 7, 1997.

Herbert L. Greenman, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, L.L.P., Buffalo, NY, for Appellant.

Denise O'Donnell, Assistant United States Attorney, Western District of New York, Buffalo, NY, for Appellee.

Before: WALKER, McLAUGHLIN, and CUDAHY,* Circuit Judges.

CUDAHY, Circuit Judge:

Donald E. Jacobs appeals his convictions and sentences for conspiracy, bank fraud and mail fraud. 18 U.S.C. § 371; 18 U.S.C. § 1344; 18 U.S.C. § 1341. After a jury trial Jacobs was sentenced to 51 months on each count, to be served concurrently. He now argues that letters from his attorney were admitted into evidence in violation of his attorney-client privilege, that the banks affected were never exposed to a risk of loss as required by the statute, that the judge erred in instructing the jury on conscious avoidance and that the district court improperly calculated his sentence under the Sentencing Guidelines. We affirm.

## I. Factual Background

Donald Jacobs apparently had a penchant for activities on the edge of legality. Jacobs was engaged in efforts to avoid taxes through the use of off-shore banking and by ownership of off-shore corporations. His involvement in these off-shore activities began at various seminars, where he met the other participants in the somewhat different scheme that has led him to his present straits. Jacobs was involved in a so-titled "Debt Elimination Program," in which unwitting debtors were enticed to purchase "certified drafts" drawn on non-existent financial entities in Mexico. First, the targeted debtor would obtain an exact accounting from the creditor to whom the debtor owed money. Then the debtor would give this information to one of Jacobs' "down-line" distributors along with a fee of about 15% of the total debt owed. In return, the debtor would receive an official-looking, but worthless, piece of paper purporting to be a "certified draft," drawn on a fictitious financial institution, with a face value equal to the debt owed. Along with this, the debtor received instructions to submit the draft to the creditor, together with a demand for the return of any collateral or evidence of indebtedness. Banks would accept the draft, but following sound banking practice, would decline to release the collateral until the draft cleared, which, of course, never happened. Thus, the debtor was out the 15% of face value paid for the draft, and the bank was out whatever expenses it incurred attempting to collect on the draft. The debtor would often be responsible for late fees and accrued interest as well as for the original balance.

Jacobs was convicted of one count of conspiracy to create fraudulent certified drafts with the intent to market the drafts to customers in the Debt Elimination Program (DEP). Jacobs was also convicted of 30 counts of bank fraud for his attempt to defraud federally insured financial institutions through the DEP. Each count of bank fraud reflected the submission of one certified draft to a financial institution. Jacobs was also convicted of mail fraud, each of these eighteen counts arising from the mailing of one certified draft to be handled by the United States Postal Service.

Jacobs now appeals his conviction, alleging that privileged communications between his attorney and himself were improperly and prejudicially admitted into evidence, depriving him of a fair trial. He also appeals the application of the bank fraud statute to a situation where he claims the banks had no risk of loss. He further challenges the calculation of "loss" for sentencing purposes. Finally, he claims that a jury instruction on conscious avoidance was erroneous.

Jacobs became associated with the DEP while attending an off-shore investment seminar in Acapulco, Mexico, in March of 1987. This seminar, which focused on off-shore banking, was hosted by Happy Dutton and attended by Paul Robinson. Paul Robinson,

---

* The Honorable Richard D. Cudahy of the United States Court of Appeals for the Seventh Circuit sitting by designation.

who also went by the names "Walter Martin," "Ed Lee," "Paul Martin" and "Leandro," was invited to the seminar after Dori Dutton (Happy's daughter) found his name on a tax protestor mailing list. Paul Robinson appears to be the "brains" behind the DEP; he introduced the scheme to Happy Dutton, who in turn hand-picked various individuals from the seminar to be "leaders." At the same time that the DEP scheme was getting off the ground, Happy Dutton continued her business running seminars on off-shore banking and off-shore corporations. In order to be a "leader" in the DEP, Jacobs was required to hold a seminar, which he scheduled for June 1987, in Cincinnati.

While in Acapulco, Jacobs obtained a Mexican driver's license and a Mexican social security card in a juristic name. The address given for these documents was the same address that appeared on the certified drafts as the drawee bank's address—a post office box in Mexico. Jacobs knew that the purchase price of the drafts (15% of their face value) was being entirely consumed by commissions for the various participants in the scheme, including 5% (or one-third of the purchase price) for the leader (*e.g.*, Jacobs) and his sales associates (or "downline" people). In addition, there was 5% for Happy Dutton and 5% for Paul Robinson (under the name, "Paul Martin"). By April of 1987 Jacobs was well on his way to registering people to attend his Cincinnati seminar and was attempting to entice people to purchase certified drafts. Testimony also showed that the DEP was discussed at Jacobs' seminar. About this time Jacobs requested that his attorney, Jay Swob, investigate the DEP and give him his opinion of its merits. Attorney Swob wrote Jacobs two letters, one on May 28, 1987, and one on July 12, 1987. Each of these letters discussed the many potential problems associated with the DEP, explained the legal liabilities that could flow from them, and strongly advised Jacobs to have nothing to do with the DEP.

After the Cincinnati seminar, things began to pick up for Jacobs. In July 1987, Jacobs (under the name, "JMR Group") presented the DEP to a group of people in Cincinnati. One of those attending was given a document prepared by Jacobs, providing, as the following quotation indicates, that direct involvement in the DEP was initially limited to those individuals who had been trained by attending Jacobs' Cincinnati seminar:

> To Prospective Debt Elimination Program Participants:
>
> . . . .
>
> 1. The JMR Group must initially limit its direct involvement to those individuals who have already been trained by attending the training meeting conducted in Cincinnati on June 9, 1987. These people paid to obtain a head start and they deserve our first priority.

By October of 1987, Jacobs was recognized as the number one producer in the DEP scheme. He received an award for his productivity. He was also involved in developing variations on the scheme, including a plan to purchase gold with the drafts. Jacobs anticipated purchasing so much gold that he was concerned about how to store it, as the following excerpt from a tape-recorded conversation illustrates:

> Don Jacobs: What I'm trying to do is figure out two things, where do I stash it, and how do I get it out of the country.
>
> . . . .
>
> Don Jacobs: I would like for you [Dori Dutton] to set up an off shore bank, and we know where to put it if I get it out of the country, my problem is $3,000 a crack. You know, move gold out . . .
>
> Dori Dutton: You're getting it virtually free though.
>
> . . . .
>
> Don Jacobs: That's why I have a problem moving it. And I'm not going to smuggle it. I don't want to get caught. I don't want to be jailed.

By November of 1987, Jacobs had been told by one customer that he had been visited by the FBI and that a local prosecutor had warned him that the drafts were a "fraudulent . . . scam . . . ." Jacobs also saw a television news story that focused on the certified drafts and alleged that Jacobs had sold Frank Patton a fraudulent draft. In re-

sponse to these events, Jacobs admitted to Frank Patton that the drafts were worthless. Yet he continued to process draft requests from his downline sellers. These actions resulted in Jacobs' indictment on June 11, 1993 and his conviction after a five week jury trial.

## II. Attorney–Client Privilege

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). The purpose of the attorney-client privilege is to foster open communication between attorneys and their clients, so that fully informed legal advice may be obtained. However, because invocation of the attorney-client privilege will necessarily exclude relevant evidence from consideration, its application must be limited in some circumstances. One such circumstance involves a waiver by the client; a second involves use of the communication in furtherance of a crime or fraud. The district court found that the crime-fraud exception applied to the two letters from Attorney Swob and therefore admitted the letters as evidence. The district court then declined to reach the issue of waiver.

### A. Crime–Fraud Exception

The crime-fraud exception removes the privilege from those attorney-client communications that are "relate[d] to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir.1994) (quoting *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1038 (2d Cir.1984)). "It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." *United States v. Zolin*, 491 U.S. 554, 563, 109 S.Ct. 2619, 2626, 105 L.Ed.2d 469 (1989) (citations omitted).

A party wishing to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime. This is a two-step process. First, the proposed factual basis must strike "a prudent person" as constituting "a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." *In re John Doe*, 13 F.3d at 637 (quoting *In re Grand Jury*, 731 F.2d at 1039). Once there is a showing of a factual basis, the decision whether to engage in an *in camera* review of the evidence lies in the discretion of the district court. *Zolin*, 491 U.S. at 572, 109 S.Ct. at 2630–31. Second, if and when there has been an *in camera* review, the district court exercises its discretion again to determine whether the facts are such that the exception applies. These factual determinations are governed by the clearly erroneous standard.

The district court here admitted as evidence two letters written by Attorney Swob to Jacobs.[1] Jacobs argues vociferously against the application of the crime-fraud exception to these letters. The letters were seized pursuant to a search warrant for Jacobs' residence. Since the letters were from Jacobs' attorney, the government appropriately turned the letters over to the district court. The government requested that the district court review the letters *in camera* and determine whether they were privileged, and if so, whether the crime-fraud exception applied.

The government was required to present a sufficient factual basis for a showing of probable cause to believe that a fraud had been committed by Jacobs and that the communications from his attorney were in furtherance of the fraud. The government did this to the district court's satisfaction by submitting tape recordings of statements made by Jacobs to an undercover FBI agent. At the

---

1. The two letters were written by Attorney Swob and addressed to Jacobs and his wife. Attached to the letters were copies of portions of the

Uniform Commercial Code, case law and legal encyclopedic excerpts.

government's request, the district court found that:

> The government has provided a sufficient factual basis. Defendant told [an undercover FBI agent] that his attorney started "lookin' into this" and gave his opinion that "if, they would honor those drafts in an acceptable manner, there was absolutely nothing about the program that was illegal." Defendant stated that his attorney spent time with certain individuals apparently in connection with matters charged in the indictment and actually attended one of the seminars. Defendant also said that his attorney told him "they were kiting the drafts that ah, he didn't know how long it would be." These statements by defendant do support a good faith belief by a reasonable person that *in camera* review of the letters from the attorney to defendant may reveal evidence to establish the claim that the crime-fraud exception applies.

Memo. Or., May 30, 1995, at 5. While providing only the minimum showing required before an *in camera* review is authorized, this decision was not clearly erroneous. The district court also found that it had alternative grounds for conducting an *in camera* review.[2]

▬▬ After review of the letters allegedly protected by the attorney-client privilege, the district court found in addition that

> a prudent person would have a reasonable basis to suspect the perpetration of a crime or fraud and that defendant's communications to his attorney were in furtherance thereof. Since "[a]dvice sought in furtherance of a future or ongoing fraud is unprivileged," the two letters and attached papers for which defendant claims the attorney-client privilege are unprotected from disclosure under the crime fraud exception.

Memo. Or., May 30, 1995, at 9 (quoting *In re Grand Jury Subpoena*, 731 F.2d at 1041). Unfortunately, the critical element necessary

for application of the exception is somewhat obscure in the district court's cursory conclusion. For the crime-fraud exception has a narrow and precise application:

> It applies only when the communications between the client and his lawyer further a crime, fraud or other misconduct. It does not suffice that the communications may be related to a crime. To subject the attorney-client communications to disclosure, they must actually *have been made with an intent to further an unlawful act.*

*United States v. White*, 887 F.2d 267, 271 (D.C.Cir.1989) (emphasis added). A wrongdoer's failure to heed the advice of his or her lawyer does not remove the privilege. The attorney-client privilege is strongest where a client seeks counsel's advice to determine the legality of conduct before taking action. With strong emphasis on intent, the crime-fraud exception applies "only when there is probable cause to believe that the communications with counsel were intended in some way to facilitate or to conceal the criminal activity." *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir.1986). It is therefore relevant to show that the wrong-doer had set upon a criminal course *before* consulting counsel. The district court carefully addressed the issue of intent when it reexamined the applicability of the crime-fraud exception in connection with a motion for reconsideration.

Before Attorney Swob wrote the May 28, 1987 letter to Jacobs, Jacobs had already agreed to host a seminar in Cincinnati and obtained a false driver's license, social security card and juristic identification in Mexico. These facts, the district court held, indicated that Jacobs had formed an intent to become involved in the debt elimination program *before* he received his attorney's advice. More inculpatory still, the evidence presented indicated that Jacobs had been picked to be a leader in the scheme and knew about the commission structure. Since the 15% purchase price was being split three ways—5% to Jacobs and helpers, 5% to Happy Dutton

---

**2.** The government also argued that the documents were not privileged because they were issued pursuant to a business relationship rather than to an attorney-client relationship. The district court held that the "government has provided a factual basis sufficient to support a reasonable, good-faith belief that *in camera* inspection may reveal evidence that information in the materials is not privileged" on grounds of business purpose. Memo. Or., May 30, 1995, at 6 n.1.

and 5% to Paul Robinson—a reasonable person would recognize that nothing remained to back the "certified drafts." A reasonable person would also have noticed, and questioned the fact, that the address for the juristic identities and each of the several banks "backing" the certified drafts was the same post office box in Mexico. Jacobs had this information before he sought Attorney Swob's advice. Thus there was evidence that Jacobs had set upon an illegal course before seeking advice about the scheme's legality; then, in the words of the district court: "What then were those communications?" Memo. Or., June 27, 1995, at 5.

Lending more weight to the reasonable belief that Jacobs intended to utilize the communications from Attorney Swob to further his fraudulent scheme is the fact that *he did so.* On several occasions Jacobs used the communications to lend credibility to the scheme, by telling prospective customers that his attorney declared the program legal. Thus, it is reasonable to believe (although there was some evidence to the contrary) that Jacobs' intent in securing Attorney Swob's opinion was to further his Debt Elimination Plan fraud. Accordingly, the attorney-client privilege cannot protect those communications, and the admission of the letters was not an abuse of the district court's discretion.

## B. Waiver

The district court declined to reach the issue of waiver of the attorney-client privilege. Since the issue of waiver is in the first instance for the district court's discretion, we reach the matter here only because the parties have extensively argued the governing principles and they stand in need of clarification.

■ Essentially, it seems to be the case here that Jacobs publicly disclosed a "summary" of the two letters from his lawyer— but a summary that inverted the analysis and conclusion. Attorney Swob's letters actually told Jacobs that the scheme was of dubious

legality and that he should steer clear of it. The bulk of the letters was a more detailed explication of this general theme. Jacobs, on the other hand, reported that his attorney had *approved* of his participation. Jacobs accomplished this deception essentially by quoting a sentence of one of the letters out of context. The problem here is that this was a disclosure that we must treat as extrajudicial and therefore one which, under the case law, may not generally be used as a basis for invoking the "fairness doctrine." [3] *See In re von Bulow,* 828 F.2d 94, 102 (2d Cir.1987).

■ *In re von Bulow* was a civil suit against von Bulow following his acquittal in a criminal trial, *State v. von Bulow,* 475 A.2d 995 (R.I.1984). After the criminal trial, the defendant "knew of, consented to, and actually encouraged attorney Dershowitz's plans to write a book providing an 'insider look' into his case." *In re von Bulow,* 828 F.2d at 100. Thus, even though the actual disclosures were made by attorney Dershowitz in the book, von Bulow impliedly waived his privilege by consenting to them. *Id.* at 101. The district court held that it would be unfair to allow von Bulow to use privileged information as a sword in public, and then invoke the privilege as a shield in the courtroom. *Id.* One of the issues presented to the district court was whether, when portions of certain conversations had been disclosed in the book, the entire conversations could be obtained in discovery. *Id.* The district court reasoned that the "fairness doctrine," which aims to prevent prejudice to a party and distortion of the judicial process by a privilege holder's selective disclosure of privileged information, required that the conversations in question be discoverable. *Id.; see also* McCormick on Evidence § 93, at 194–95 (2d ed.1972). On appeal, this court held that this application of the fairness doctrine was too broad, since the doctrine generally applies only to those privileged communications that are disclosed in a judicial proceeding. Thus, the *extrajudicial* disclosure of a portion of an attorney-client conversation (as in the book) cannot in itself

---

**3.** While it may be possible to argue that Jacobs made a judicial waiver by referring to the letters in court, we must assume that he would not have done so absent the district court's grant of the government's motion in limine. Thus, we treat Jacobs' disclosures as extrajudicial, at least for purposes of this discussion.

waive the privilege as to the rest of the conversation. *In re von Bulow*, 828 F.2d at 102. The *von Bulow* court, however, did recognize that the attorney-client privilege had been waived with respect to any "matters *actually disclosed* in the book," even though the disclosures were extrajudicial. *Id.* The question, in the case before us, is whether Jacobs "actually disclosed" the content of Attorney Swob's letters when he misrepresented to third parties that Swob had approved the legality of the DEP. The facts before us may be distinguished from the conversations sought to be discovered in *In re von Bulow.* Here, the essence of the situation seems to be that Jacobs, in conveying his attorney's advice to third parties, omitted a "not" from the information conveyed, thereby altering by 180 degrees the gist of the attorney's advice. The two letters seem to be essentially elaborations of reasons why the activities in question might very well *not* have been legal. In *In re von Bulow*, on the other hand, there is no indication that the remainder of the conversations sought to be discovered was merely an elaboration of the material disclosed.

▮ An inaccurate statement of a privileged communication waives the privilege with respect to that communication. *United States v. Mendelsohn*, 896 F.2d 1183, 1188–89 (9th Cir.1990). Mendelsohn was selling an illegal bookmaking computer program through the U.S. mails, and in the course of a sale told a potential customer (actually an undercover federal agent) that his attorney had said that selling the program was legal. *Id.* Mendelsohn then argued that "there was no waiver because he did not truthfully disclose the advice his attorney gave him and he did not disclose a significant portion of attorney-client communication." *Id.* at 1188. The Ninth Circuit found, and we agree, that the privilege is waived even if the defendant misstated what his attorney told him. *Id.* Of course, in such a case the waiver extends only to the specific communication involved and not generally to other communications on the same subject. For Jacobs, this seems to mean that the waiver of his attorney-client privilege extends to the two letters written by Attorney Swob, the gist of which Jacobs purported to convey while selling the DEP. Whether this conclusion involves an application of the "fairness doctrine" is questionable.[4] Strictly speaking the letters do not seem to be admissible to avoid a distortion of the judicial process. Instead, they may be admitted because their gist has been disclosed and they add literal meaning to that disclosure and correct the error in Jacobs' rendition.[5] Here the substance of the two letters was disclosed (albeit incorrectly). There thus appears to have been a waiver as to the two letters, and they may be introduced to indicate their true import.[6]

---

4. The admission of the letters serves essentially the same *purpose* as would this admission under the fairness doctrine: the introduction of the letters clarifies the meaning of what Jacobs disclosed. Here, however, what is being admitted is not a related communication but is properly regarded as the same communication. This would be clearer if Jacobs had said, "I received *two letters* from my lawyer, giving me the green light." However, we do not believe that the specific mention of the letters is necessary for a waiver as to them.

5. The extraneous matter of attorney Swob's personal opinion as to the credibility of those running the seminars was also mentioned in the letters, but redacted for the jury. Further, attorney Swob also discussed his legal opinion of the off-shore banking and off-shore enterprises discussed at the seminar, this too was largely redacted before being given to the jury. We note that all matters in these documents which were not mere elaborations of counsel's opinion of the legality of the DEP scheme should have been redacted upon proper motion.

6. Testimony showed that Jacobs had represented to customers that his attorney had told Jacobs that the DEP was legal. For example, witnesses testified that "[Jacobs] told us that he had an attorney on retainer, that he had run all the trust papers and talked to him and showed him the drafts and we were under the impression that everything was legal ... Don told us that he had, Mr. Attorney Swob had said that the paperwork was legal." Further, at a Miami seminar, Jacobs was tape-recorded giving a DEP sales pitch where he stated:

> Our attorney ... I can give you his background ... and we used him ... he checked out this program for legality and I can share with you what he said. Basically, was that there is virtually nothing at all anywhere that can cause us any problem if the draft is honored when it is presented.

Tape Recording 214C. The reality, however, is that Attorney Swob's letter to Jacobs read (in part) as follows:

> Will the financial instruments used to pay off your client's debt obligations, be properly hon-

■ Public, even extrajudicial, disclosures constitute a waiver of the privilege "for the *communications or portions of communications* disclosed." *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 469 (S.D.N.Y. 1996) (emphasis supplied). In *Kidder Peabody,* a report was publicly released which paraphrased specific statements made in the course of arguably privileged communications. *Id.* at 470. The court held that the privilege was waived as to the specific statements, since "[d]isclosure of the substance of a privileged communication is as effective a waiver as a direct quotation since it reveals the 'substance' of the statement." *Id.* In the instant case, Jacobs (incorrectly) disclosed the substance of the two letters. His waiver, which served to waive the substance of the letters, was as effective a waiver as a direct quotation (or a copy of the letters).

## III. Risk of Loss

One element required for a conviction of bank fraud is actual loss or exposure to "risk of loss." *United States v. Ragosta,* 970 F.2d 1085, 1089 (2d Cir.1992) (citing *United States v. Stavroulakis,* 952 F.2d 686, 694 (2d Cir. 1992)). Jacobs argues that the district court misapplied the requirements of the "risk of loss" element. First, he contends that because the certified drafts were submitted in payment of pre-existing debts, the only risk of loss suffered by the bank occurred when the debts were created. Presentment of the drafts, Jacobs argues, in no way affected the bank's risk of loss because the debtor remained liable for the underlying debt. Essentially, the contention is that, with the presentment of a certified draft, the bank was no worse off than if the drafts had not been presented at all. Jacobs also contends that, for those counts for which the government presented evidence of actual loss, he should have been allowed to present his theory of defense to the jury. That theory holds that any loss suffered by the bank originated with the creation of the debt, not with the presentment of the certified drafts. Second,

ored and paid in acceptable monetary form when processed thru the banking system for presentment and collection of funds?
If "YES," then I see no significant legal roadblock toward the implementation of the programs. However, since you will in all likelihood be dealing with offshore entities who will provide the financial pay-off instrument, you will have no control over the process, and very little, if any recourse should payment ever be dishonored....
Therefore, I would advise your participation in such programs *only* if all down payment monies, application fees, deed conveyances, etc., are done in an extended escrow within the jurisdiction of Ohio courts.
....
If "NO," then I would suggest that you refrain from participating in the program in all respects....
Now, how do you know if a dishonor will occur? Answer: you don't! Therefore, I must advise that you proceed on the assumption that a dishonor may occur; and because of that possibility, I must advise that you do not involve yourself in the programs,....
....
However, the criminal liability could be horrendous:
(1) State fraud
(2) State conspiracy
(3) State RICO (Racketeering and Influenced Corrupt Organizations Act)
(4) State securities violation
(5) Federal bank fraud
(6) Federal conspiracy
(7) Federal RICO
(8) Federal securities violation
(9) Federal foreign corrupt practices act
... your participation (overall) in the program would, in my opinion, be more than sufficient to give rise to criminal liability.
On balance, I cannot in good conscience recommend your participation in these programs. [Specific concerns:]
The draft has the notation of "certified" on it; certified by whom?—and in what capacity? Frankly, I have never heard of a certified draft; the customary notation is an "accepted draft."
—In a draft, you generally have a 3–party document: Drawer, Drawee, and Payee. In a note, you have Maker (also called a Payor) and a Payee. Yet, in the draft which you presented to me, the Drawer is referred to as a "Payor"—this is confusing and not standard.
—The Drawee's address is the same as Servicio Bustos!
—The wording of the draft says that it is "redeemable in 'current funds (credit)' when presented ..." The use of 'current funds' under ORC 1303.06 (UCC 3–107) means payable in money (currency); yet the parenthetical calls for "(credit)," an obvious inconsistency with Ohio UCC law.
—"Protest" will be required upon dishonor of this draft since it is payable outside of the U.S. (ORC 1303.56 (UCC 3–501)[)]. This is a clear "time-delayer."
....
... let me reiterate my overall recommendation to you: Don't do it!

he argues that the district court incorrectly measured loss for sentencing purposes by taking the face value of the drafts as the potential or intended loss instead of calculating that the amount paid for the purchase of the worthless drafts was the actual loss (approximately 15% of face value).

### A. Actual vs. Potential Loss Under the Statute

The bank fraud statute provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344. Jacobs argued in the district court, and reasserts here, that the presentment of the fraudulent certified drafts did not create any enhanced risk of loss to the banks. The underlying debts were not discharged upon receipt of the certified drafts, but would have been discharged only if and when the drafts were paid. Since the drafts were never paid, no debts were ever discharged. Additional costs, such as interest or expenses incurred in attempting to collect the drafts were chargeable to the debtor. Thus, Jacobs argues that the element of intent to defraud a financial institution was never proved, and could not have been proved, by the government. The district court disagreed, stating that

actual loss need not be proven. The scheme to defraud clause of the bank fraud statute requires only that defendant expose the bank to a risk of loss .... even proof of an extremely remote risk will suffice, ....

. . . .

Defendant argues that the submission of the drafts did not put the banks at risk. Rather, the risk arose directly from the terms of the original agreement with the customer, ... Risk of loss, defendant contends, was present from the time a bank extended a line of credit and was in no way increased by submission of a worthless draft, ...

This Court disagrees. Submission of a worthless certified draft to a financial institution creates a risk of loss different in kind and different in degree from the risk of loss present at the time the institution extended the line of credit. Submitting a worthless certified draft creates a risk that the bank will honor the draft, return its evidence of the existence of the debt, and discharge the debt. This risk does not inhere in the creation of a line of credit. Submitting the worthless draft also creates the risk that the bank will release its security for invaluable consideration, another risk that does not inhere in the creation of a line of credit. Because of these additional risks of loss, different in kind and degree, the evidence concerning loss that defendant seeks to elicit is of no consequence and will be excluded as irrelevant.[7]

In order for the bank fraud statute to apply, the fraud must be against the bank. For example, a scheme to pass bad checks is

---

**7.** Jacobs also argued that for those counts for which the government chose to prove actual, rather than potential, loss, he should have been allowed to present his theory that the loss was attributable to the debtor's failure to pay and not to the presentment of the certified drafts. The district court denied an opportunity to present this theory on the same grounds as it denied the defense's theory of lack of potential loss:

> You're arguing that the actions of the debtor really occasioned the loss and you can't directly attribute it to the certified drafts because payments were missed, or bankruptcy was filed. No, that's not—that's not the way it is. That resulted in a certain loss, but so did the

submission of the certified drafts. That occasioned another risk of loss or a part of a risk of loss in this whole scheme are the net results of what took place following the submission of the drafts.

The district court should have either excluded any evidence of actual loss or should have allowed Jacobs to present his theory of defense. Failure to allow the theory of defense was error, but it was harmless error. The government could have easily proved risk of loss for these counts in the same way as it did for other counts, and it was therefore unnecessary to show actual loss.

not bank fraud. *United States v. Orr*, 932 F.2d 330 (4th Cir.1991). Here, Jacobs argues that he cannot be convicted of bank fraud because he never intended that the banks would incur any loss. Instead it was the debtors who were the victims of the fraud. This ignores the fact that the conspirators instructed the debtors to present the certified drafts to the creditor banks in discharge of their debts.

The bank fraud statute was enacted to " 'protect[ ] the financial integrity of [federally guaranteed financial] institutions, and ... assure a basis for Federal prosecution of those who victimize these banks through fraudulent schemes.' " *Stavroulakis*, 952 F.2d at 694 (quoting S.Rep. No. 225, 98TH CONG., 2d Sess. 377 (1983), *reprinted in*, 1984 U.S.C.C.A.N. 3182, 3517). The statute was modeled on the mail and wire fraud statutes, and Congress indicated that it wanted the bank fraud statute to be interpreted as broadly as those statutes. *Id.* Consequently, "a conviction under the 'scheme to defraud' clause of the bank fraud statute requires ... a pattern or course of conduct designed to deceive a federally chartered or insured financial institution into releasing property, with the intent to victimize the institution by exposing it to actual or potential loss." *Id.*

In *United States v. Blackmon*, 839 F.2d 900, 904 (2d Cir.1988), this court held that where the fraud (a "pigeon drop" scheme [8]) is aimed not at the bank, but at an individual, the offense is not *bank* fraud. In *Blackmon*, the victim was induced to voluntarily withdraw all of her money from a bank and turn it over to certain confidence men. This, we held, was not conduct covered by the bank fraud statute. *Id.* On the other hand, a scheme can be primarily directed at a third party and still give rise to bank fraud. In *Morgenstern*, the defendant engaged in a scheme to embezzle money from his employer by representing to the employer that it owed more in payroll taxes than was actually the case. The employer wrote and signed

checks payable to Chemical Bank which the defendant deposited into an account over which he had control. *United States v. Morgenstern*, 933 F.2d 1108, 1112–13 (2d Cir. 1991). We held that Morgenstern had committed bank fraud, because, in order to effectuate his scheme, the defendant was required to misrepresent to the bank that he had the authority to deposit these checks into an account over which he had control. Further, he engaged in a scheme designed to misrepresent his status to the bank, by mixing legitimate business with his fraudulently obtained checks. In this way, he misrepresented himself to the bank in order to fraudulently obtain control over money which was not his to control. *Id.* at 1113.

The problem now before us is that, had the certified drafts never been created, sold and presented, the risk of loss would have turned on the debtor's ability to pay. *After* presentation of the fraudulent drafts, the bank's risk would ultimately have similarly turned on the debtor's ability to pay. There is, therefore, a real question whether the bank's risk has been increased.

But, for purposes of this statute, the risk can be said to have been increased in that there was some possibility—at least a potential—that the bank would release security, delay efforts at collection or otherwise act in reliance upon its receipt of the certified drafts. Admittedly, the possibility of such actions in reliance may be rather remote since banks are cautious; but such actions are not impossible and, under the case law, a mere possibility of detrimental reliance is enough. In other words, the bank has been put in harm's way and, for purposes of construing the statute, we must assume a highly incautious bank. Another way of analyzing the problem is to think of the bank's acquisition of the certified draft as decreasing its risk (admittedly in the illusory belief that the draft might be good). Subsequently, this decreased risk was again heightened when the certified draft proved to be worthless. Thus, there was an increase in risk though

---

8. In a "pigeon-drop" scheme, valuable-looking foreign "money" or "certificates" are dropped on the sidewalk, and some fancy cajoling traps a gullible victim into emptying her bank account.

*See United States v. Jones*, 648 F.Supp. 225, 226–28 (S.D.N.Y.1986) (describing the fraud in detail).

only back to the level that existed before the draft was presented.

The case law indicates that an "intent to victimize the institution by exposing it to actual or potential loss" is required. *Stavroulakis*, 952 F.2d at 694. Here Jacobs apparently had little realistic prospect of actually causing loss to the bank. But this is not required. What is required is an intent to place the bank at risk of diminishing or delaying its ability to collect the debt. In this case, there was also an intent to create expectations in the bank, which were later dashed.

*Stavroulakis* presents a fact situation somewhat analogous to the one before us. In *Stavroulakis* the defendant engaged in a scheme of selling stolen blank checks, for which he was convicted of bank fraud. Even though he argued that he only intended to sell the checks, and had no fraudulent intentions with respect to the bank, we found that "[i]nherent in a sale of stolen checks is that they will eventually be presented to the drawee bank for payment; and payment over a forged signature exposes a bank to real loss." *Stavroulakis*, 952 F.2d at 695. Similarly, Jacobs may have intended to defraud his customers by inducing them to purchase certified drafts which he knew were not "worth the paper they're printed on," but inherent in that transaction was the risk that the certified drafts would eventually be presented to the creditor as payment, and acceptance of a false certified draft would expose the creditor bank to real loss. The risk of release of collateral or other action in reliance by the banks here is perhaps less than that of a forged signature in *Stavroulakis,* but for purposes of construing the statute, a potential is all that is required.

The bank fraud statute covers Jacobs' conduct because his DEP scheme exposed the banks to a risk of loss through the invalid certified drafts.

**9.** Guideline § 2F1.1 applies to fraud and calls for a base offense level to be increased depending on the amount of loss occasioned by the fraud (or of the amount of intended loss when the fraud is unsuccessful). Thus, Jacobs' base level was in-

## B. For Sentencing Purposes

 Jacobs also objects to the use of the face value of the certified drafts in assessing intended loss under the Sentencing Guidelines § 2F1.1.[9] This issue is related to the risk of loss question discussed above, but presents somewhat different considerations. In addressing the sentencing problem, one must remain aware of what were the actual and intended objects of the fraud. The obvious, direct (and "actual") victims were, and were intended to be, the debtors who bought the worthless drafts at about 15% of their face value. The losses suffered by these victims accrued directly to the pecuniary benefit of the conspirators. The subsequent phase of the fraud consisted of the debtors presenting the drafts to their banks in payment of their loans (in accordance with the instructions of the conspirators). As we have indicated in our discussion of statutory risk of loss, the underlying debts would not generally have been discharged upon receipt by the banks of the certified drafts but would have been discharged only if and when the drafts were paid. Since the drafts were never paid, no debts were ever discharged. If the debts *had* been discharged, any loss to the banks would have accrued to the pecuniary benefit of the debtors, not to the benefit of the conspirators. The task before us is to fit these and other facts into the provisions of the Guidelines measuring "loss."

Jacobs argues that he consistently maintained his innocence and asserted his belief that the drafts would be honored. Therefore, he argues, he never intended any loss to the banks. This argument was rejected by the jury when it convicted him, and there is sufficient evidence to support this conclusion. The question then turns on whether the loss should be based on the actual loss suffered by Jacobs' customers (the individuals who purchased the drafts and attempted to use them in payment for their debts) or based on a possible and "intended" loss to the banks (as represented by the face value of the drafts). Jacobs further argues that the in-

creased by 11 points because the face value of the drafts was approximately $6,000,000.00, which exceeded the 2F1.1(b)(1)(N) $5,000,000.00 threshold. The 1987 version of the Guidelines were used in sentencing Jacobs.

dictment did not charge him with seeking a "face value" loss to the banks, and that for sentencing purposes the loss must be limited to the value of lost interest (by the banks) and the money lost by the purchasers of the drafts. *See* Indictment, June 11, 1993.

 We review legal interpretations of the Sentencing Guidelines construing the term "loss" de novo. *United States v. Mucciante,* 21 F.3d 1228, 1237 (2d Cir.1994). Factual findings supporting the district court's offense level calculation are reviewed under a clearly erroneous standard. *Id.* It is well established that "loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1 comment. n.8; *United States v. Stanley,* 54 F.3d 103, 106 (2d Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 238, 133 L.Ed.2d 166 (1995). It is also accepted that loss may consist of probable or intended loss. U.S.S.G. § 2F1.1 comment. n.7; *United States v. Gomez,* 31 F.3d 28, 31 (2d Cir.1993).

The question what is the "loss" for sentencing purposes is highly fact-intensive, and the case law must be applied with caution. For example, "[i]n applying this flexible, fact-driven concept of loss, we have thus held that in situations where value passes in only one direction ... the perpetrator's gain will normally reflect the victim's loss." *United States v. Dickler,* 64 F.3d 818, 825 (3d Cir. 1995). We start with the fundamental dichotomy between "actual" and "intended" loss, and the prescription to take the higher of the two. *See, e.g., United States v. Resurreccion,* 978 F.2d 759, 762 (1st Cir.1992) (holding intended loss should be used in sentencing, even if imprecise, when larger figure than actual loss). In the present case, actual loss is, as noted, the total amount paid by the debtors for the worthless certified drafts plus all losses suffered by the banks in the temporary loss of use of their funds. This actual loss is limited from the outset and is also the limit of Jacobs' gain. Intended loss is a much more elusive concept. The relevant guideline, U.S.S.G. § 2F1.1, formerly re-

ferred to "probable or intended" loss, but the dropping of "probable" from the formula is presumably not significant. *See United States v. Wimbish,* 980 F.2d 312, 314–15 (5th Cir.1992). "Probable" seems still to be an appropriate standard because one is presumed to intend the natural and "probable" consequences of one's acts. *See, e.g., Rankin v. Farmers Elevator Mutual Ins. Co.,* 393 F.2d 718, 720 (10th Cir.1968) ("Persons are presumed to intend the natural and probable consequences of their acts."). In fact, this idea seems to be imbedded in the analysis, for example, of the loss caused by forged instruments. Here, intended loss seems presumptively to refer to losses that might naturally and probably flow from the fraud.

In any event, the concept underlying the distinction between actual and intended loss is that a defendant may have the goal of depriving the victim or victims of more than the constraints of the situation "actually" permit. The significance of the defendant's acts should be measured by his intentions.[10] *See generally,* U.S.S.G. § 2F1.1 comment. & background. For example, a perpetrator forged a check for $40,000, but was only able to get $20,000 from the victim who bought it. *See* U.S.S.G. § 2F1.1 comment. n.7. The actual loss is $20,000, but the intended loss is $40,000, and this determines the sentence. Perhaps the present case is that simple, but there are additional facts to be considered. In *United States v. Agwu,* 5 F.3d 614 (2d Cir.1993), the defendant forged Travelers Express money orders with imprinted values totaling $47,330, which he sold for $2,500. This circuit found that the imprinted (face) values were the proper measure of loss. *Id.* at 615. In *Mucciante,* 21 F.3d 1228, the defendant forged Australian government bonds, which he furnished to the victim in exchange for funds placed under the defendant's control. The district court calculated the loss on the basis of the funds placed under the defendant's control. An alternative calculation was based on the face value of the bonds, but, strictly speaking, this was unnecessary to support the sentence im-

10. Guideline § 2F1.1 allows for upward and downward departures when the loss calculated either "does not fully capture the harmfulness and seriousness of the conduct" or "overstate[s] the seriousness of the offense." U.S.S.G. § 2F1.1 comment. n.10.

posed. *Id.* at 1237. In neither *Agwu* nor *Mucciante* was there any apparent reason to believe that the instruments would *not* be negotiated or paid for at their face value, causing loss to someone in the amount of the face value. On the other hand, in the present case, the bank's position is initially established by a loan agreement with the debtor. It is unlikely that a bank would surrender its rights against the debtors until assured of the value of the certified draft. This sort of apparent restraint on loss did not exist in the same way in either *Agwu* or *Mucciante.*

In *United States v. Joetzki,* 952 F.2d 1090 (9th Cir.1991) (not a bank fraud case), the defendant wrote a number of checks against a brokerage "cash management account" that held no funds. One of these checks was for $5 million. The check made its way through banking channels but was not honored by the drawee brokerage house. The Ninth Circuit recognized the face value of the check as the proper measure of "loss." Again there was nothing to show that the defendants did not intend that the check be honored at its face value. The court held that the government had the burden of showing that the defendant "attempted to inflict the loss." *Id.* at 1096. Presumably the same showing would be required of the government in the present case.

As noted, any loss to be realized by the bank would not accrue directly to the benefit of the defendant; it would accrue to the benefit of the debtors. Any major loss to be suffered by the bank would have to be occasioned by its own act in prematurely discharging a debtor. If intent is the test, did Jacobs intend that the bank discharge the debtors' indebtedness? Was such discharge the natural and probable consequence of the fraud?

As part of the larger scheme, the conspirators clearly intended that the drafts be presented to the banks. In fact, the conspirators instructed the debtors to present the certified drafts to the bank and to seek discharge of the debt. What the conspirators intended thereafter is the heart of the problem. The indictment describes the purposes of the conspiracy, in part, as follows:

It was a further object of the conspiracy to submit and cause the submission of such "certified drafts" to federally insured financial institutions, using the United States mails. It was further the object of the conspiracy to delay detection of the fraudulent and worthless nature of the "certified drafts," using various tactics which were also calculated to deprive the federally insured financial institutions of the immediate use of their funds and credits.

Indictment, June 11, 1993, at 3–4. The reference to "immediate use" presumably excludes an intent to have the banks release their security or otherwise incur the full loss of the loans. On the other hand, the government argues that the defendant's "scheme was aimed at the heart of the American banking system, seeking to 'eliminate' real debt with worthless drafts. Characterizing banks and bankers as the enemy, describing participation in the program as a 'battle' or 'war,' and referring to the Federal Reserve as a 'rotten bunch,' the stated purpose of the DEP was to 'return the favor.' " Gov't Br. at 46. If this contention is well-founded it would provide an independent basis for considering the "loss" to be the face value of the drafts.

*United States v. Wimbish, supra,* cites *United States v. Kopp,* 951 F.2d 521 (3d Cir.1991), as rejecting "possible" loss as a standard. *Wimbish,* 980 F.2d at 315. In *Wimbish,* the defendant stole personalized checks, forged them and had them deposited; he requested cash back from the depositor. The issue was whether loss should be measured by the face value of the checks or by the actual amount withdrawn. "Wimbish put the victims at risk for the full loss, despite the subsequent recovery of the amount Wimbish did not receive." *Id.* at 315. This case thus suggests a "put at risk" standard. Such a standard would support a face value measure in the present case since the creditors' positions were "put at risk." *Wimbish, id.* at 316, also cites *United States v. Hooten,* 933 F.2d 293 (5th Cir.1991), in which a credit union employee stole a customer's note for $1.5 million and offered to sell it back to the customer for $150,000. The face value of the note was held to be the correct measure of

loss because it represented the "potential loss" to the credit union. Thus, these cases seem rather perplexingly to approve "potential loss," *Hooten,* 933 F.2d at 298, while disapproving "possible loss," *Kopp,* 951 F.2d at 533.

In one subset of cases intended loss has been found to be less than the face value of a loan or contract obtained through fraud. *United States v. Schneider,* 930 F.2d 555, 558 (7th Cir.1991), distinguished between fraud when the offender intends to pocket the full gain and fraud when the offender means to repay the gain (by paying off a loan or completing a contract), but could not have secured the obligation without the fraud. In the first situation the intended loss is the full value secured. In the second situation the intended loss may be zero, "[a]t least in a narrow financial sense." *Id.*

In *United States v. Haggert,* 980 F.2d 8 (1st Cir.1992), Haggert presented fraudulent sight drafts (drawn on a financial institution that was not legitimate and operating) in the amount of $62,508.50 to pay delinquent real estate mortgages. The bank believed the drafts to be cashier's checks and stamped them "paid." The bank's actual loss was $20,248.10. The court noted, in assessing loss at face value, that, "[a]s the *Schneider* distinction between two types of fraud illustrates, even under the exception for loan application and contract procurement cases, the intent of the defendant is the measure by which the loss is to be assessed." *Id.* at 13. Intent to inflict the full amount of the fraud is key.

In a different vein, *United States v. Smith,* 951 F.2d 1164 (10th Cir.1991), represents a conservative approach to loss measurement. *Smith* involved a defendant who operated a concern that built and marketed single family residences. Smith misrepresented to a bank that various customers of his had made down payments on homes when in fact such payments had not been made. The Tenth Circuit held that the loss was not to be measured by the cumulative value of the loans ($440,896). There was no evidence in the record for finding that Smith attempted to inflict a loss of $440,896; no loans were in default at the time of sentencing. But the district court had found that there was an intended loss of $440,896.

Smith did receive the money as seller, but he returned to the lenders security interests in the homes and the promises of the individual buyers to repay the loan. The court held that there was no actual loss and no basis in the record for finding an intended loss. *Id.* at 1167, 1169. Therefore there was no enhancement. This result follows from § 2F1.1 comment. n.7(b), which dictates that the loss in a loan transaction is the difference between the loaned amount and the amount of the collateral. On appeal in *Smith* the government never argued that Smith intended to cause loss in the full amount of the loans, only that " 'the potential that these six loans may eventually go into default is ever present.' " *Id.* at 1169. This would seem to be enough under a "put at risk," "potential loss" standard. But *Smith* testified that each of the six loans was secured by the house on which the loan had been made and that the buyers had been paying down on their loans. The court said that it did "not believe the possibility that some loss might occur on one or more of the six loans in the future amounts to the 'probable' loss contemplated by section 2F1.1." *Id.* The government had simply failed to offer any support for its calculation. The court distinguished *United States v. Johnson,* 941 F.2d 1102 (10th Cir. 1991), on the grounds that in *Johnson* the defendant intended to take the full value of the homes. Johnson's goal in the fraud was *not* to meet his obligations under the loan. *Johnson,* 941 F.2d at 1114. In contrast, Smith never intended that any participant (bank or home buyer) lose any money. *Smith,* 951 F.2d at 1169. The *Smith* court also distinguished another *Johnson* case, *United States v. Johnson,* 908 F.2d 396 (8th Cir.1990), on the grounds that "the focus for sentencing purposes should be on the amount of possible loss which [the defendant] attempted to inflict on the banks." *Smith,* 951 F.2d at 1169 (quoting *Johnson,* 908 F.2d at 398). The *Smith* court's approach is not expansive, and it refrains from delving into potential losses or increases in risk.

The evidence in the present case indicates that banks are widely known to process pay-

ments other than cash through a system that ensures that the funds are collectible before crediting an account with, for example, the face value of the certified drafts. And the conspirators here may not really have expected that the banks would release collateral temporarily—let alone permanently—upon receipt of the certified drafts; after all, the conspirators knew that the drafts were fraudulent. Nonetheless, release of collateral might be one reaction by the banks in this type of situation, causing them loss. And, after all, the conspirators *instructed* the debtors to ask for release of collateral and discharge. The government presented evidence that some banks temporarily returned the evidence of debt to the debtor and released collateral.

Ultimately, intended loss is dependent on the findings of the trial judge. The district court here specifically found that "the object of the scheme was for the bank to return its evidence of debt to the customer, release the collateral that secured the debt, and discharge the customer's debt in exchange for the draft." Based, among other things, on the conspirators' instructions to the debtors, we cannot say that this finding is clearly erroneous. The finding is a sufficient basis for concluding that it was intended or probable that the bank suffer a loss measured by the face value of the drafts. Thus, the district court did not clearly err in calculating the intended loss for sentencing purposes.

## IV. Jury Instructions on Conscious Avoidance

 Jacobs argues that the district court's decision to instruct the jury on conscious avoidance was not based on a proper factual predicate. The district court instructed the jury that, if it found that Jacobs was aware that there was a high probability that a scheme to defraud existed and that Jacobs had consciously avoided confirming that fact, it could find Jacobs guilty, unless it also found that he actually believed that he and his associates were acting in a lawful manner. Jacobs argues that there was no evidence pointing to a conclusion that he consciously avoided learning the truth about the DEP. Rather he claims that the evidence

indicated that he attempted to learn all he could about the DEP and that the true masterminds of the DEP conspired to keep the truth from him.

 We review the record to determine if the evidence presented permitted a rational juror to conclude beyond a reasonable doubt " 'that the defendant was aware of a high probability of a fact in dispute and consciously avoided confirming that fact.' " *United States v. Hopkins,* 53 F.3d 533, 542 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 773, 133 L.Ed.2d 725 (1996) (quoting *U.S. v. Rodriguez,* 983 F.2d 455, 458 (2d Cir.1993)). A charge on the defendant's conscious avoidance is proper when the element of knowledge is in dispute, and when the evidence permits a rational juror to conclude beyond a reasonable doubt that the defendant was aware of the high probability of a fact in dispute and avoided confirming that fact. *Id.* Even when the government attempts to prove actual knowledge, an instruction on conscious avoidance can still be appropriate. *Id.*

Much of the evidence, contrary to Jacobs' assertions, tends to indicate actual knowledge. Thus when Jacobs chose to plead ignorance, he created the need for a jury instruction on conscious avoidance. The jury heard evidence that Jacobs had participated in conversations with other DEP leaders in which they discussed whether it was unfair to use the certified drafts to purchase homes and cars from individual owners (as opposed to banks), how to purchase gold with the drafts and how to get the profits out of the country. Evidence also showed that Jacobs was aware of other indications of the illegality of the DEP. For instance, Jacobs was aware that the 15% of face value paid for the drafts was split among the salespeople and leaders, none going to any Mexican financial entity. Jacobs obtained false identification, structured his transactions to avoid a record of his involvement and concerned himself with a means to remove money from the country without alerting federal officials. Jacobs also knew that participants at DEP seminars were required to sign a form swearing "under penalty of perjury" that they were not federal agents. Finally, the

sheer implausibility of paying off one's debts by paying 15% of the amount owed makes it at least somewhat apparent that the scheme was illegal. Thus, the district court was correct to instruct the jury on the theory of conscious avoidance.

## V. Conclusion

Donald Jacobs was engaged in a fraudulent scheme to defraud individual debtors, banks and other creditors. After being convicted of conspiracy, bank fraud and mail fraud, Jacobs appealed on several points.

Key pieces of evidence included two letters written to Jacobs by his attorney. After evaluating Jacobs' knowledge and actions before receipt of the letters and his use of certain portions of the letters during the course of the DEP, we affirm as not clearly erroneous the district court's application of the crime-fraud exception to the attorney-client privilege with regard to these letters. We also conclude, though not required to do so, that Jacobs waived the attorney-client privilege as to the letters by disclosing their substance (incorrectly and dishonestly) on a number of occasions.

The government made a sufficient showing of intent to defraud the banks to support the verdict of bank fraud. The bank fraud statute only requires a showing of potential loss. In addition, intended loss, realistically considered, is important in calculating an appropriate sentence under the Sentencing Guidelines. Based on the findings of fact of the district court that the conspirators intended to inflict a loss amounting to the face value of the certified drafts on the banks, the calculation of loss for sentencing purposes was correct. Finally, we approve the district court's conscious avoidance jury instruction. There was sufficient evidence to justify the instruction.

AFFIRMED.