[966 NYS2d 420]

In the Matter of NEW YORK CITY ASBESTOS LITIGATION.

WEITZ & LUXENBERG P.C. et al., Respondents, v GEORGIA-PACIFIC LLC, Appellant.

First Department, June 6, 2013

### APPEARANCES OF COUNSEL

*Quinn Emanuel Urquhart & Sullivan, LLP*, New York City (*Kathleen M. Sullivan* of counsel), and *Lynch Daskal Emery LLP*, New York City (*Scott Emery* of counsel), for appellant.

*Weitz & Luxenberg P.C.*, New York City (*Jerry Kristal* and *Alani Golanski* of counsel), for respondents.

### OPINION OF THE COURT

ANDRIAS, J.P.

This discovery dispute pertains to all of the Weitz & Luxenberg New York City Asbestos Litigation (NYCAL) cases in which Georgia-Pacific (GP) is a defendant. For the following reasons, we find that the motion court providently exercised its discretion when it denied GP's motions to vacate the Special Master's recommendations and directed an in camera review of certain internal communications identified in GP's privilege log and the production to plaintiffs of certain underlying data related to eight published research studies funded by GP concerning the health effects of its joint compound.

GP funded these studies in 2005 to aid in its defense of asbestos-related lawsuits. The studies were performed by experts from various organizations, who, among other things, recreated GP's historical joint compound product for the purpose of testing its biopersistence and pathogenicity. To facilitate the endeavor, GP entered into a special employment relationship with Stewart Holm, its Director of Toxicology and Chemical Management, to perform expert consulting services under the auspices of its in-house counsel, who also was significantly involved in the prepublication review process.

At Holm's deposition, plaintiffs requested that GP produce all documents relating to the studies. GP produced certain documents and a privilege log asserting that all communications with its consulting experts were protected by the attorney work product privilege and that its internal communications were protected by the attorney-client privilege. The Special Master directed an in camera review of all documents identified in GP's

privilege log (Recommendation #1), and production of all materials and raw data underlying the published studies (Recommendation #2).

The motion court denied GP's motion to vacate the Special Master's recommendations, as well its motion for leave to reargue the in camera prong of that decision to narrow its scope (2011 NY Slip Op 33158[U] [2011]). GP appeals, arguing that plaintiffs failed to make the necessary showings to warrant in camera review of internal privileged communications or production of work product data and that ordering that review and production is an unwarranted intrusion into GP's privileged communications.[1]

■ The motion court providently exercised its broad discretion in supervising disclosure when it confirmed Recommendation #1 and granted in camera review of the documents to determine whether the crime-fraud exception to the attorney-client privilege applied (*see Those Certain Underwriters at Lloyds, London v Occidental Gems, Inc.*, 11 NY3d 843, 845 [2008]).

The crime-fraud exception encompasses " 'a fraudulent scheme, an alleged breach of fiduciary duty or an accusation of some other wrongful conduct' " (*Art Capital Group LLC v Rose*, 54 AD3d 276, 277 [1st Dept 2008], quoting *Ulico Cas. Co. v Wilson, Elser, Moskowitz, Edelman & Dicker*, 1 AD3d 223, 224 [1st Dept 2003]). "[A]dvice in furtherance of a fraudulent or unlawful goal cannot be considered 'sound.' Rather advice in furtherance of such goals is socially perverse, and the client's communications seeking such advice are not worthy of protection" (*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F2d 1032, 1038 [2d Cir 1984]).

A party seeking "to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of

---

1. GP complied with Recommendation #1 to the extent that it submitted for in camera review all communications to and from its consulting experts. On July 11, 2011, the Special Master found that the documents she reviewed were privileged and that no documents were discoverable other than those that GP had agreed to supply. The ruling was limited to GP's communications to and from its consulting experts that GP had produced, and did not otherwise modify or vacate the recommendations in respect of GP's claim of attorney-client privilege (internal communications) and the attorney work-product privilege regarding the underlying data, which remained in full force and effect.

the fraud or crime" (*United States v Jacobs*, 117 F3d 82, 87 [2d Cir 1997]; *see also Ulico Cas. Co.*, 1 AD3d at 224; *Matter of Grand Jury Subpoena*, 1 AD3d 172 [1st Dept 2003]). However, "[a] lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege" (*United States v Zolin*, 491 US 554, 572 [1989]).

To permit in camera review of the documents to analyze whether the communications were used in furtherance of such wrongful activity, there need only be "a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies" (*id.* [internal quotation marks and citation omitted]). "Once that showing is made, the decision whether to engage in *in camera* review [of the evidence] rests in the sound discretion of the . . . court" (*id.*).

Holm coauthored nearly all of the studies, which were intended to cast doubt on the capability of chrysotile asbestos to cause cancer. On the two articles that he did not coauthor, he and GP's counsel participated in lengthy "WebEx conferences" in which they discussed the manuscripts and suggested revisions. Despite this extensive participation, none of the articles disclosed that GP's in-house counsel had reviewed the manuscripts before they were submitted for publication. Two articles falsely stated that "[GP] did not participate in the design of the study, analysis of the data, or preparation of the manuscript." For articles lead-authored by David M. Bernstein, Ph.D., and coauthored by Holm, the only disclosure was that the research was "sponsored" or "supported" by a grant from GP. The articles did not disclose that Holm was specially employed by GP for the asbestos litigation or that he reported to GP's in-house counsel. Furthermore, there were no grant proposals, and Dr. Bernstein was hired by GP on an hourly basis. Nor did the articles reveal that Dr. Bernstein has been disclosed as a GP expert witness in NYCAL since 2009, that he had testified as a defense expert for Union Carbide Corporation in asbestos litigation, or that he had been paid by, and spoken on behalf of, the Chrysotile Institute, the lobbying arm of the Quebec chrysotile mining industry. Although GP belatedly endeavored to address the inadequacies of certain of its disclosures, its corrections failed to acknowledge its in-house counsel's participation and did not make clear that Dr. Bernstein's testimony as an expert witness preceded the publication of the first GP reformulated joint compound article in 2008.

■ The foregoing constitutes a sufficient factual basis for a finding that the relevant communications could have been in furtherance of a fraud, and the motion court properly confirmed the recommendation directing in camera review of the internal documents. As the court remarked, it is of concern that GP's in-house counsel would be so intimately involved in supposedly objective scientific studies, especially in light of GP's disclosures denying such participation (*see United States v Philip Morris USA, Inc.*, 449 F Supp 2d 1 [D DC 2006] [applying the fraud-crime exception, in regard to defendants' litigation-related efforts to skew smoking and health research], *affd in relevant part* 566 F3d 1095 [DC Cir 2009], *cert denied* 561 US —, 130 S Ct 3501 [2010]).[2]

■ The motion court providently exercised its discretion when it confirmed Recommendation #2 and directed GP to produce all documents and materials underlying the published studies over which it has possession, custody, or control, including, but not limited to, microscopy images, the data generated in the chambers where the reformulated compounds were created, and numerical calculations, and to act in good faith to secure its consulting experts' compliance with the direction to produce.

Attorney work product under CPLR 3101 (c), which is subject to an absolute privilege, is limited to "documents prepared by counsel acting as such, and to materials uniquely the product of a lawyer's learning and professional skills, such as those reflecting an attorney's legal research, analysis, conclusions, legal theory or strategy" (*Brooklyn Union Gas Co. v American Home Assur. Co.*, 23 AD3d 190, 190-191 [1st Dept 2005]). Documents generated for litigation are generally classified as trial preparation materials (CPLR 3101 [d] [2]) unless they contain otherwise privileged communications, such as memoranda of private consultations between attorney and client (*see People v Kozlowski*, 11 NY3d 223, 244 [2008]). Trial preparation materials are subject to a conditional privilege and may be disclosed "only upon a showing that the party seeking discovery has [a]

---

2.   ■ Plaintiffs' contention that this portion of the appeal is moot because GP complied with the order and produced the data pending review on appeal is without merit. While this Court may not be able to return the parties to the status quo ante since plaintiffs now have acquired the information in the underlying data, "a court can fashion *some* form of meaningful relief in circumstances such as these," including ordering the destruction or return of materials disclosed (*Church of Scientology of Cal. v United States*, 506 US 9, 12-13 [1992]).

substantial need of the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means" (CPLR 3101 [d] [2]; *Giordano v New Rochelle Mun. Hous. Auth.*, 84 AD3d 729, 732 [2d Dept 2011]). This Court has also observed that "it is unfair for the opposing party in a litigated controversy to . . . use this privilege both as a sword and a shield, to waive when it enures to her advantage, and wield when it does not" (*Matter of Farrow v Allen*, 194 AD2d 40, 45 [1st Dept 1993] [internal quotation marks omitted]).

The results of the published studies commissioned by GP are relevant, and it cannot be seriously disputed that plaintiffs have a substantial need for the underlying data in the preparation of their cases. "Large corporations often invest strategically in research agendas whose objective is to develop a body of scientific knowledge favorable to a particular economic interest or useful for defending against particular claims of legal liability" (*In re Welding Fume Prods. Liab. Litig.*, 534 F Supp 2d 761, 768 n 10 [ND Ohio 2008] [internal quotation marks omitted]). "The publication of [research] findings and conclusions invites use by persons whom the findings favor and invites reliance by the finders of fact. The public has an interest in resolving disputes on the basis of accurate information" (*Application of Am. Tobacco Co.*, 880 F2d 1520, 1529 [2d Cir 1989]). Here, GP commissioned the studies in anticipation of litigation and has admitted that "[a]t an appropriate time and after their publication is complete, GP plans to introduce the results of the studies in litigation."

In determining whether plaintiffs are unable without undue hardship to obtain the substantial equivalent of the materials by other means, due consideration must be given to the fact that discovery in NYCAL is governed by the September 20, 1996 Case Management Order (CMO), as amended May 26, 2011, which is designed to "allow the parties to obtain reasonably necessary documents and information without imposing undue burdens in order to permit the parties to evaluate the case, reach early settlements, and prepare unsettled cases for trial." The court has "full authority, under the controlling [CMO], to issue its discovery order pertaining to ongoing cases" (*Matter of New York City Asbestos Litig.*, 66 AD3d 600, 600 [1st Dept 2009] [denying the defendant's claims that it be permitted to shield analogous materials via a protective order]).

Given the complexity of the studies, the motion court was rightfully wary of prejudicing plaintiffs by permitting the sudden introduction of the studies or experts on the eve of trial, or in the many other pending asbestos trials. As the court found, principles of fairness, as well as the spirit of the CMO, require more complete disclosure, and GP should not be allowed to use its experts' conclusions as a sword by seeding the scientific literature with GP-funded studies, while at the same time using the privilege as a shield by withholding the underlying raw data that might be prone to scrutiny by the opposing party and that may affect the veracity of its experts' conclusions (*see John Doe Co. v United States*, 350 F3d 299, 302 [2d Cir 2003]; *see also Niagara Mohawk Power Corp. v Stone & Webster Eng'g Corp.*, 125 FRD 578, 587 [ND NY 1989]).

Plaintiffs will be prejudiced if they are prevented from discovering the data, protocols, process, conduct, discussion, and analyses underlying these studies. A significant expenditure of time and money would be required to duplicate the studies, if they could be exactly duplicated at all, whereas scrutiny of the underlying data may provide a permissible manner in which to attack the findings that would be consistent with the intent of the CMO to minimize the cost of and streamline discovery.

In this regard, we note that the court limited its ruling to the data, samples, and materials that relate to those studies whose results have been published or will be published. GP is not required at this juncture to produce to plaintiffs any internal communications that portray its attorneys' or consultants' notes, comments or opinions. Moreover, GP will be free to make whatever pretrial in limine application it deems appropriate.

Finally, no appeal lies from the order denying reargument (*Stratakis v Ryjov*, 66 AD3d 411 [1st Dept 2009]).

Accordingly, the order of the Supreme Court, New York County (Sherry Klein Heitler, J.), entered December 12, 2011, which confirmed recommendations of the Special Master directing an in camera review of all internal attorney-client and work-product documents identified on defendant GP's privilege log, and directing the production of all materials and raw data underlying several published studies funded by GP, should be affirmed, without costs. The appeal from the order, same court and Justice, entered June 14, 2012, which denied GP's motion for reargument, should be dismissed, without costs, as taken from a nonappealable order.

SWEENY, FREEDMAN, FEINMAN and GISCHE, JJ., concur.

Order, Supreme Court, New York County, entered December 12, 2011, affirmed, without costs. Appeal from order, same court and Justice, entered June 14, 2012, dismissed, without costs, as taken from a nonappealable order.