UNITED STATES of America,

v.

Stephen J. SABBETH, Defendant.

No. 97–CR–0421 (DRH).

United States District Court,
E.D. New York.

Feb. 2, 1999.

Zachary W. Carter, United States Attorney, Brooklyn, NY, by Seth L. Marvin, Asst. U.S. Atty, for U.S.

Newman Schwartz & Greenberg, New York City, by Gustave H. Newman, for defendant.

## MEMORANDUM AND ORDER

HURLEY, District Judge.

Presently before the Court is the government's *in limine* motion seeking a determination that the attorney-client privilege is not a bar to the introduction of certain testimony sought to elicited from James B. McKinney, Jr., Esq. ("McKinney"). McKinney is an attorney who was associated with the now defunct law firm of Bower & Gardner ("B & G"). B & G represented Sabbeth Industries, Ltd. ("SIL"),—whose sole shareholder was defendant Stephen J. Sabbeth ("Sabbeth" or "defendant"),—prior to and during SIL's bankruptcy proceedings.

For the reasons hereinafter indicated, each of the government's proffers, but for number 1, is found to be admissible.

## INTRODUCTION

Sabbeth stands accused in a six count indictment with (1) conspiring to, and with the corresponding substantive crime of endeavoring to, defeat certain bankruptcy provisions of Title 11 of the United States Code by fraudulently transferring and concealing property belonging to SIL in violation of Title 18, United States Code, Sections 371 and 152 (Counts One and Two), (2) giving perjured testimony during the course of the SIL bankruptcy proceedings in violation of Title 18, United States Code, Section 152 (Counts Three, Four and Five), and (3) money laundering vis-a-vis the money unlawfully transferred and concealed from SIL, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

The grand jury has alleged that Sabbeth received a series of fraudulent transfers from SIL shortly before the corporation went into bankruptcy and, in an effort to secrete such funds from SIL's corporate creditors, placed the monies in a clandestine account opened in the name of "C. Fiore" using false pedigree information. As gleaned from the indictment—and the government's proffer regarding the present motion—the C. Fiore Account (the "Account") was opened in December of 1989. At that time, SIL was indebted in the amount of $14 million to National Westminster Bank and Manufacturers Hanover Trust Co. (collectively, the "banks") under a jointly-funded revolving line of credit. During the last half of 1990, while SIL was on the brink of bankruptcy, over $750,000 in SIL funds were transferred to Sabbeth via fifty-five corporate checks. Mr. Sabbeth endeavored to prevent the tracing of the funds through what the government describes as "a complicated and circuitous series of transfers from

account to account," with the bulk of monies ultimately being deposited into the Account. (Gov't's Mem. in Support at 6.)

B & G commenced its representation of SIL on August 29, 1990. It filed a Chapter 11 voluntary reorganization petition on behalf of its client on December 28, 1990. However, the banks—having learned, *inter alia,* that Sabbeth had withdrawn the previously-noted amounts from SIL on the eve of bankruptcy—insisted that SIL find a third party to acquire the banks' position under the threat of forcing the corporation into a Chapter 7 liquidation.

Sabbeth arranged for Robert Gans ("Gans") to purchase the banks' interest for twenty-seven cents on the dollar. The $395,-000 good faith deposit was provided by Gans, and the transaction approved by the Bankruptcy Court. But while the Court and the banks knew that the $395,000 was furnished to Gans by defendant's wife, they were unaware that she derived the funds primarily, if not exclusively, from SIL through her husband.

In June of 1991, Gutman & Gutman replaced B & G as counsel for SIL in the bankruptcy proceeding.

### PROFFERED TESTIMONY OF MCKINNEY

In an effort to prove that defendant had the requisite state of mind to establish the charged fraudulent transfers and concealment of property belonging to SIL, the government has proffered the testimony of McKinney, who, as noted previously, was a former member of the bankruptcy department at B & G.[1] The proffered testimony has been divided by the government into six parts, the underlined portions of which are identified as the specific subjects of the present *in limine* motion. Those six parts are:

1. *Lowe was furious and wanted to cease representing SIL when he learned from the banks, in late November or early December of 1990, that Sabbeth had taken substantial sums of money from SIL on the eve of bankruptcy.* No one from SIL was present when Lowe said this.

2. The banks and SIL continually negotiated orders for the use of the banks' cash collateral. The banks wanted Sabbeth to put up additional collateral as security for the banks' claims against SIL in exchange for agreeing to allow SIL to continue to use the banks' cash collateral. Sabbeth was present at the meetings held with the banks to negotiate these matters. *McKinney would ask Sabbeth before such a meeting whether he (Sabbeth) or any of his friends or relatives had assets which could be put up as additional collateral for the banks in exchange for the banks' agreeing to allow SIL to continue to use their cash collateral. Except for the one occasion discussed below, Sabbeth would answer "no". McKinney would make clear to Sabbeth that he was asking Sabbeth this question for the purpose of being able to negotiate with the banks. The banks would ask at the meetings whether any additional assets could be put up in exchange for the banks' agreeing to allow SIL to continue to use the banks' cash collateral. The banks would be told "no". On one occasion the banks were told that Sabbeth had approximately $30,-000 which he could put up as additional collateral. The banks insisted that this $30,000 be provided to them as additional security for their claims.*

3. *During the time that B & G represented SIL, McKinney did not know that*

---

[1] The government has indicated that "[w]hen McKinney provided this proffered testimony to the government he was represented by counsel who advised McKinney that the information he was providing was not subject to the attorney-client privilege." (Gov't's Mem. in Support at 14, n. 3.) Accordingly, the *in camera* procedure for review of purportedly privileged information approved in *United States v. Zolin,* 491 U.S. 554, 569, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), and mentioned in, *e.g., United States v. Jacobs,* 117 F.3d 82, 87 (2d Cir.1997), was not followed in the present case. Rather, the government provided both defendant and the Court with the specific proffered testimony of McKinney in its motion *in limine,* albeit the motion was submitted under seal.

Sabbeth had given the money which he withdrew from SIL to his wife nor did McKinney know at that time of the existence of the C. Fiore account, which had inaccurate pedigree information, and which contained money which Sabbeth had taken from SIL. Nor, to McKinney's knowledge, did anyone else at B & G know these things. If McKinney had known these things, he would have disclosed them to the Court, sought an order from the Court freezing the account, and brought an action to recover the money which Sabbeth had taken from SIL.

4. If SIL had been able to put up an additional $600,000 as collateral this would have made the difficult negotiations with the banks over the further use of their cash collateral easier. In addition, even without the banks' consent, an additional $600,000 of collateral would have significantly improved SIL's litigation position in being able to obtain a contested cash collateral order from the Bankruptcy Court.

5. *At the time that the Gans transaction took place McKinney did not know that the $395,000 which was being loaned by Carole Fiore Sabbeth to Gans was being paid from the C. Fiore account, which had inaccurate pedigree information, and which contained money that Sabbeth had taken from SIL. As far as McKinney knew, no one else at Bower and Gardner knew this. If McKinney had known this he would have disclosed it to the Court, sought to freeze the account, and brought an action to recover the money which Sabbeth had taken from SIL.* Although B & G stated to Judge Duberstein that the Court was receiving "full disclosure" as to the details of the transaction, *"full disclosure" was not being made because the Court was not learning of the fact that the $395,000 was being paid from the C. Fiore account which contained money which Sabbeth had taken from SIL.*

6. *Sabbeth, conveying surprise, stated to McKinney during the Gans transac-* *tion negotiations that he (Sabbeth) did not know that his family had that kind of money. McKinney believed that Sabbeth was saying this to explain why he had not previously told McKinney about this money before each cash collateral negotiation.*

(Gov't's Mem. in Support at 14–17.)

The government argues that the underlying portions of the proffered testimony of McKinney are admissible, notwithstanding the attorney-client privilege, because (1) the testimony is not covered by the privilege and (2) even if, *arguendo*, it were, it is, nonetheless, admissible under the crime-fraud exception to the attorney-client privilege.

As to the relevance of the information, the government labels what was said or, in some cases, not said by Sabbeth as "highly probative of [his] guilt," demonstrating:

(1) that Sabbeth and Fiore did not disclose to B & G, until after the fact, that on the eve of bankruptcy and during B & G's representation of SIL they withdrew large sums of money from SIL,

(2) that Sabbeth and Fiore did not disclose to B & G that they had transferred these funds to, and concealed them in a clandestine account, called the "C. Fiore account," which they opened with bogus pedigree information, and

(3) that Sabbeth and Fiore were able to use B & G to help conceal from SIL's creditors and from the bankruptcy court the existence and nature of the clandestine Fiore account.

(*See* Gov't's Mem. in Support at 2–3.)

*DISCUSSION*

1. *Attorney–Client Privilege.*

 While the attorney-client privilege is " 'the oldest of the privileges or confidential communications known to the common law,' " *In re Richard Roe, Inc.,* 68 F.3d 38, 39 (2d Cir.1995) (citing *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)), it is narrowly construed to provide no broader protection than is necessary to accomplish its purpose given that its invocation serves to withhold relevant in-

formation from the triers of fact. *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). Its purpose "is to foster open communication between attorneys and their clients, so that fully informed legal advice may be obtained." *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997). Consistent with that purpose, the attorney-client privilege seeks to assure that clients will "be free to 'make full disclosure to their attorneys' of past wrongdoing ... in order that the client may obtain 'the aid of persons having knowledge of the law and skilled in its practice....'" *United States v. Zolin*, 491 U.S. 554, 562, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) (citations omitted).

■ The person who invokes the attorney-client privilege has the burden of establishing its applicability. *United States v. White*, 950 F.2d 426, 430 (7th Cir.1991).

### 2. Crime–Fraud Exception.

■ The rationale underlying the attorney-client privilege, however, is not promoted by affording confidentiality to communications between a client and the client's attorney that are in furtherance of an ongoing fraudulent scheme. As a result, "all Courts agree that the lawyer-client privilege does not extend to [such] communications" which are said to fall within the crime-fraud exception. *Weinstein on Evidence*, Section 503.31[1] at 503–91.

■ "It warrants underscoring that the exception applies only when the Court determines the client communication ... in question was *itself* in furtherance of the crime or fraud." *In re Richard Roe, Inc.*, 68 F.3d at 40. And finally, it should be noted that the failure of the scheme, *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1039 (2d Cir.1984), or the fact that the attorney may have been oblivious to the significance of the communication made by the client is not controlling. *United States v. Ballard*, 779 F.2d 287, 292 (5th Cir.1986). Rather, and to partially reiterate, if a defendant intentionally provides information to his or her attorney which would otherwise be privileged, but

with the intent that the communication itself would serve to advance an ongoing fraudulent scheme, then the communication is not shielded from disclosure.

Typically, of course, the applicability of the privilege would be addressed before a possible exception to the privilege. But here, the government asked during oral argument that the crime-fraud exception be considered initially, arguing that the total proffer is clearly admissible on this basis; accordingly, the more common analytical sequence will be reversed. Only to the extent that the government's reliance on the exception falls short of the mark will the legitimacy of the defendant's assertion of the privilege in the first instance be discussed.

■ For the government to establish the applicability of the exception it "must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime." *United States v. Jacobs*, 117 F.3d at 87. Those two elements will now be discussed:

#### a) Reasons to Believe Fraud Committed

■ Here the government has clearly established—whether the standard be probable cause or some higher standard such as clear and convincing evidence[2]—that there is a factual basis to believe that Sabbeth was involved in a fraudulent scheme to divert monies from SIL and to thereafter conceal the diversion from corporate creditors during the bankruptcy proceeding.

The probable cause found by the grand jury in returning the indictment is supplemented by the findings of Bankruptcy Judge Goetz who concluded, after conducting hearings as part of the SIL bankruptcy proceeding that, *inter alia*, (1) "The purpose of the C. Fiore Account was to secrete and to conceal the funds which Stephen Sabbeth transferred to his wife [which he obtained from SIL] by putting them in an account with

---

**2.** Defendant opined during oral argument (Jan. 6, 1999 Tr. at 17) that Supreme Court precedent suggests a higher standard than probable cause

is required as to this first prong of the two-part analysis delineated above. *See generally In re John Doe, Inc.*, 13 F.3d 633, 637 (2d Cir.1994).

which neither had any apparent relationship" (Ex. A of Gov't's Supplemental Exs. in Supp. Mot. at 16) and (2) that "[n]either Mr. Sabbeth nor Mrs. Sabbeth testified truthfully regarding the circumstances under which, nor the reasons why the C. Fiore Accounts were opened." (*Id.* at 25.)

Moreover, the very nature of the attendant circumstances to the establishment of the Account lends support to the conclusion that the government has satisfied the first criterion for the crime-fraud exception. *Cf. In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1041.

### b) *Communications Made in Furtherance of Scheme to Defraud*

The next question is whether one or more of the six numbered proffers constitutes a communication intended by Sabbeth to further his efforts to conceal monies diverted from SIL.

■ Defendant correctly notes that simply "[r]etaining and then being less than candid with counsel ... cannot be enough to establish the crime/fraud exception and destroy the attorney-client privilege. Otherwise, [defense counsel cautions] few clients would retain the privilege." (*See* Def.'s Mem. in Op. at 14.)

■ Properly applied, however, the exception does not threaten the viability of the attorney-client privilege. Firstly, it has no bearing on communications between attorney and client which pertain to the defense of a completed act. And secondly, even for ongoing schemes, only communications geared to further criminal conduct implicate the exception. For present purposes, that means that for the government to prevail it must show a reasonable basis to believe that Sabbeth gave false or incomplete information to B & G, with the concomitant expectation that counsel would utilize that information—unwittingly or otherwise—to advance the defrauding of corporate creditors.

### b) *Consideration of Government's Proffers Under the Crime–Fraud Exception*

With the above principles in mind, attention will now be directed to each of the proffers:

■ i) Proffer 1. The government has failed to demonstrate that the first item of proffered testimony, *i.e.*, that "Lowe was furious ... when he learned from the banks ... that Sabbeth had taken substantial sums of money from SIL on the eve of bankruptcy," falls within the exception.

Lowe's state of mind is only relevant insofar as it is traceable to Sabbeth misleading him regarding payments received from SIL. But did Lowe or Sabbeth ever broach that subject? [3] The answer to that question may not be determined from the proffer made. Perhaps Lowe was furious because he failed to ask a question that would elicit such information. Sabbeth's simple failure to mention the transfers or the Account absent any related request by McKinney concerning such matters specifically, or generally—if that is what happened—would not constitute a *communication* for purposes of the crime-fraud exception.

In sum, the government has not demonstrated a reasonable basis to believe that Sabbeth made a communication to his attorney concerning the subject in question. Therefore, its effort to place proffer 1 before the jury under the crime-fraud exception is denied.

■ ii) Proffer 2. The government, in proffer 2, makes reference to various discussions had between McKinney and Sabbeth before the meetings with the banks regarding SIL's continued use of encumbered assets to meet corporate obligations. As per the proffer, "McKinney would ask Sabbeth before such a meeting whether he (Sabbeth) or any of his friends or relatives had assets which could be put up as additional collateral for the banks in exchange for the banks' agreeing to allow SIL to continue to use their cash collateral." By failing to mention the

---

**3.** For instance, had B & G asked Sabbeth to list all monies that he had received from SIL during, *e.g.*, the year 1990, and Sabbeth neglected to list the transfers alleged in the indictment, that in-

complete and misleading response would satisfy the "communication" requirement of the crime-fraud exception.

Account, the government maintains that it may be inferred that Sabbeth misled counsel for the purpose of concealing the monies taken from the corporation thus satisfying both the requirement of a communication between attorney and client, as well as the requirement that such communication be intended to advance the ongoing fraudulent conduct. This argument is found to be without merit.

The use of the term "could be" in the present context is ambiguous. Would a reasonable person, confronted with the questions posed to Sabbeth, believe that he or she was being asked for a listing of (1) controlled assets generally or (2) only such assets as the person, or his or her relatives or friends, would be willing to offer in aid of the bankrupt corporation? This lack of precision in proffer 2, considered in conjunction with overriding importance of the attorney-client privilege to our system of jurisprudence, causes the Court to conclude that this proffer has not been shown to be within the crime-fraud exception.

 iii) Proffer 3. This proffer pertains to McKinney's lack of knowledge regarding the Account and that, had B & G been aware of that Account and the way its was funded, it would have, as the attorney for SIL, brought an action to recover the monies for the benefit of the corporation.

The threshold question is whether it appears from the proffer that McKinney's unawareness is attributable to a communication with Sabbeth. As was true concerning proffer 1, mere silence in and of itself is insufficient to trigger the exception. Accordingly, McKinney's lack of knowledge, and his belief that others at B & G were similarly unaware, has not been shown to be admissible under the crime-fraud exception.

iv) Proffer 4. No portion of this paragraph is underlined, indicating that the Court is not being asked to render a ruling. As a result, none will be made.

4. Sabbeth, as noted, was the sole shareholder of SIL. As such, he retained B & G for the corporation, suggesting that the privilege belongs to SIL, not him. Nonetheless, both Sabbeth and SIL

 v) Proffer 5. This proffer concerns McKinney's unawareness—and his belief that others at B & G were also unaware—that the $395,000 down payment furnished by Gans came from the Account which, in turn, was funded with SIL monies. Here, again, the proffer is inadequate to establish that this lack of knowledge is traceable to a communication by Sabbeth.

 vi) Proffer 6. Unlike proffers 1 through 5, the government has demonstrated the applicability of the crime-fraud exception to Sabbeth "conveying surprise" to McKinney "that his family had that kind of money" upon his wife tendering the $395,000 down payment to Gans. Not only has a communication been identified by the government in its proffer but, given the concomitant circumstances, a reasonable person could legitimately conclude that the comment was intended to further the concealment of the diversion of SIL funds. Had McKinney known of the Account, he would have, as previously noted in proffer 3, sought to recover the monies for B & G's client, SIL.[4] Sabbeth's feigned surprise tended to prevent that process from being undertaken by quelling possible further inquiry by B & G as to the connection between the $395,000 and Sabbeth and/or SIL.

Finally, Sabbeth's argument that the charged wrongdoing was consummated upon his receipt of monies from SIL—thereby rendering the exception inapplicable to proffer 6—is unpersuasive. (*See* Jan. 6, 1999 Tr. at 14, 15.) Granted, B & G could have commenced an action to set aside the transfers upon learning of their existence from the banks. And, yes, that could have been done absent information about the Account. But that fact does not support the conclusion urged, *viz.*, that the scheme was no longer ongoing once the payments were made, for that argument ignores the twofold character of the charges. Sabbeth is said to have fraudulently transferred monies from SIL, and with thereafter endeavoring to conceal those transfers. To the extent that monies

have invoked the privilege in an effort to shield any communications between Sabbeth and B & G from disclosure.

taken were buried in an account seemingly unrelated to Sabbeth, recovery problems were compounded and the concealment aspect of the crime advanced. *See Richard Roe, Inc.,* 68 F.3d at 40 (exception applies to communications "intended in some way to facilitate *or to conceal* the criminal activity") (emphasis added); *see also Ballard,* 779 F.2d at 293.

For the reasons indicated, the government has demonstrated that the communication contained in proffer 6 is admissible as within the crime-fraud exception. However, McKinney's belief as to Sabbeth's purpose in making the statement is inadmissible as, *inter alia,* usurping a function properly belonging to the jury.

### d) *Conclusions Re Crime–Fraud Exception*

In sum, and with the exception of proffer 6, the government has failed to demonstrate the applicability of the crime-fraud exception. Sabbeth's purported failure to disclose to B & G the transfers received from SIL, and the routing of the proceeds to the Account, standing alone, may not be equated with a communication within the purview of the exception. More is required such as, *e.g.,* a request by counsel that calls for such information to be furnished by the client.

Attention will now be directed to the admissibility of proffers 1 through 5 independent of the crime-fraud exception.

### 3. *Inadmissibility of Proffer 1 Independent of Crime–Fraud Exception*

 This proffer includes Lowe's state of mind, and the reason for his state of mind, all to be reported by McKinney. Assuming that McKinney could testify that he observed Lowe to be "furious," it is unclear what evidentiary Rule or theory would permit the witness to ascribe a basis for Lowe's dismay. Any effort by McKinney to do so presumably would constitute impermissible hearsay un-

der Rule 801, and would additionally run afoul of Rule 602 ("Lack of Personal Knowledge") and 702 ("Testimony of Experts"). Moreover, the government has not argued that the proffer falls within Rule 701 ("Testimony by Lay Witnesses"), or is admissible under one or more of hearsay exceptions set forth in Rule 803. Accordingly, the government may not elicit the subject of proffer 1 at the trial.

### 4. *Inapplicability of Attorney–Client Privilege to Proffers 2, 3 and 5*

 As noted, defendant has the burden of establishing that a communication is protected. In an effort to discharge that obligation, defendant has simply asserted the privilege across the board, absent any specificity. However, such blanket assertions of the privilege are disfavored. *Federal Trade Comm'n v. Shaffner,* 626 F.2d 32, 37 (7th Cir.1980); *see also P. & B. Marina, Ltd. Partnership v. Logrande,* 136 F.R.D. 50, 54 (E.D.N.Y.1991) (Weinstein, J.), *aff'd,* 983 F.2d 1047 (2nd Cir.1992); *In re Shopping Carts Antitrust Litig.,* 95 F.R.D. 299, 305 (S.D.N.Y.1982).

 For the privilege to be properly invoked, there must be, *inter alia,* a communication relating to the purpose for which legal advice was sought. 8 Wigmore, *Evidence* § 2292 at 554 (McNaughton rev.1961). Yet, Sabbeth has made no claim that the subjects embodied in the government's proffers were discussed by him with B & G. For example, was the question of SIL payments to him ever raised, directly or indirectly? Of course, such information could have been provided by defendant to the Court *in camera,* thereby avoiding a possible compromise of privilege as a result of its invocation if that were defendant's concern.

 If the subjects of the proffers were discussed—and were therefore communications between attorney and client—then that element of the privilege would be present.[5]

5. While it may be that "silence or even nondisclosure may [also] be a 'communication' ... protected by the attorney-client privilege" in an appropriate case, *United States v. White,* 970 F.2d 328, 334 (7th Cir.1992), that possibility has not been pursued by Sabbeth. Nothing has been

provided to indicate that the SIL transfers, or the Account, were the subject of communications between counsel and client or were so intertwined with the subjects that were discussed to be within the protection afforded by the privilege. *But see United States v. White,* 950 F.2d

Ironically, however, any such discussions would not only bear on the existence of the privilege which defendant seeks to establish, but would also be likely to fill the void in the government's unsuccessful effort to establish that proffers 2, 3 and 5 are admissible as being within the crime-fraud exception. In any event, Sabbeth has failed to establish that any of the proffers are protected from disclosure under the attorney-client privilege.

 Proffer 2 is admissible for another reason as well. While an attorney is a spokesperson for the client, and simply performing that function—whether during plea negotiations, at trial, or otherwise—does not erode the privileged nature of the communications between them, here it is reasonable to believe, given the totality of the circumstances, that Sabbeth understood that his comments about no other assets being available as additional collateral would be relayed virtually verbatim to the banks. Under such circumstances, the utterances were not intended to be confidential and the privilege does not attach. *United States v. Tellier*, 255 F.2d 441, 447 (2d Cir.1958).

## CONCLUSION

The government's proffers have been evaluated by the Court under Federal Rule of Evidence 104(a).

Proffer 1 is inadmissible for the reasons discussed above.

Proffers 2, 3 and 5 are admissible because defendant has failed to demonstrate the applicability of the attorney-client privilege.

Proffer 6 is admissible. The government has demonstrated that the communication therein falls within the crime-fraud exception even if, *arguendo*, it is assumed that the statement is otherwise privileged.

SO ORDERED.

426, 430, n. 2 ("Mr. Center [*i.e.,* counsel in bankruptcy court for defendant thereafter charged criminally with bankruptcy fraud] told AUSA Bennett that no one disclosed any information not contained in the bankruptcy schedule (*i.e.,* information about assets not included in the White's personal bankruptcy petition. The district court found that this information was not [ ] client communications, but 'lack of communication' [for purposes of the attorney-client privilege.]")).