**UNITED STATES OF AMERICA,**

v.

**Barbara Renor JASPER, Defendant.**

**No. S1 00 CR. 0825(PKL).**

United States District Court,
S.D. New York.

Nov. 10, 2003.

James B. Comey, United States Attorney for the Southern District of New York, (Daniel A. Braun, of counsel), New York City, for U.S.

Roger Bennett Adler, New York City, for Defendant Barbara Renor Jasper.

### OPINION AND ORDER

LEISURE, Judge.

On March 21, 2003, following a two-week jury trial, defendant Barbara Renor Jasper was convicted of one count of embezzlement, in violation of 18 U.S.C. § 657. On July 22, 2003, this Court denied defendant's motion for a judgment of acquittal

pursuant to Rule 29 of the Federal Rules of Criminal Procedure and defendant's motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Having fully reviewed the detailed submissions of the government, the defendant and the probation office regarding the proper sentence for the defendant, the Court now sentences Jasper to 37 months of imprisonment, followed by three years of supervised release. The Court further orders her to pay $433,615 in restitution as well as a $100 mandatory assessment.

## BACKGROUND

The defendant is a native of Trinidad who came to the United States in 1978 for medical treatment of a congenital heart problem. (United States District Court Southern District of New York Probation Office, Presentence Investigation Report at 9 (Sept. 10, 2003) ("PSI")). Defendant later received permanent resident status and ultimately became a naturalized citizen in 1988. Since 1979 she has resided in Brooklyn, New York. (*Id.*)

From April 2, 1984 to May 19, 2000 the defendant was employed by the United Nations Federal Credit Union ("Credit Union") in Manhattan. (*Id.* at 12.) The Credit Union is a cooperative financial institution for employees and retirees of the United Nations and affiliated agencies. The Credit Union has approximately 1.6 billion dollars in assets and operates two branch offices in Manhattan, known as the DC 2 Branch and the Secretariat Branch, both located in the vicinity of the United Nations headquarters. The Credit Union also operates seven automated teller machines ("ATMs"), two of which are located at the Secretariat Branch. The Credit Union initially hired Jasper as a bank teller in 1984 and later promoted her to branch manager of the Secretariat Branch. (*Id.* at 12.) On August 4, 2000, a grand jury indicted Jasper, charging that between 1997 and May 15, 2000 she embezzled funds from the Credit Union while performing routine ATM replenishments in violation of 18 U.S.C. § 657.

At trial, the government introduced extensive evidence, including documents, witness testimony and a videotape. The chief witness for the government was James W. Fenimore, the Credit Union's Vice President for Finance during the relevant time period. Mr. Fenimore testified that in early 2000, as the result of questions raised by an external audit of the Credit Union, he began to investigate the amount of money contained in the Credit Union's ATMs. This investigation led him to conclude that over $600,000 was missing from the ATM accounts and prompted him to further investigate the shortfall. Mr. Fenimore's investigation, detailed in testimony and documentary evidence introduced by the government, revealed that on more than 200 occasions between September of 1997 and May 15, 2000 the defendant under-reported the amount of money she removed from the Secretariate Branch ATMs. He also found that the defendant failed to submit the proper paperwork for her ATM replenishments, which would have readily shown the discrepancy. Mr. Fenimore's investigation concluded that the total amount under-reported by the defendant was in excess of $400,000.

In addition to Mr. Fenimore's testimony and the documentary evidence supporting his investigation, the government introduced a videotape taken from the security camera at the Secretariat Branch, purporting to show the defendant stealing money from an ATM on May 15, 2000. This videotape was also offered to show that the defendant performed the ATM replenishment alone that day, rather than with another employee as required by the Credit Union's dual control procedure for

replenishing ATMs. Credit Union Employees who testified on behalf of the government further explained that when they were assigned to replenish ATMs with the defendant, the dual control policies often were not followed and that Jasper would sometimes instruct the teller assigned to dual control to return to her teller duties. It was the government's theory of the case that this left Jasper alone to replenish the ATM, skim cash for herself, and alter the Credit Union's records to cover her tracks.

The defendant's case consisted largely of character witnesses who testified to Jasper's reputation for truthfulness and honesty. These witnesses included a senior political affairs officer for the United Nations, an inspector for the U.N. security service, and a former co-worker, as well as individuals who knew Jasper in a social context. In addition, Jasper took the stand and testified that she had followed Credit Union procedures in replenishing the ATMs, suggesting that mistakes by other Credit Union employees led to the missing cash. She further testified that she did not knowingly alter Credit Union records nor did she embezzle money from the ATMs.

At the conclusion of the trial, the jury found Jasper guilty of embezzling cash from the Credit Union. The U.S. Attorney's Office, the Probation Office, and the defendant have now submitted papers regarding the proper sentence for the defendant's crime under the Sentencing Guidelines ("Guidelines") and have appeared before the Court at today's sentencing hearing. The parties' submissions reflect considerable disagreement over the appropriate offense level under the Guidelines and, accordingly, the appropriate sentence for the defendant. In particular, there are disputes as to 1) the total loss resulting from the defendant's crime for the purposes of determining the offense level, 2) whether the offense level should be increased because of the degree of planning involved, 3) whether the offense level should be increased because the defendant abused a position of private trust, 4) whether the offense level should be increased because the defendant obstructed justice, and 5) whether the Court should grant a downward departure in sentencing due to the defendant's medical condition. Defendant further asks that her term of incarceration not begin until after the Christmas/New Year holiday and that her prison term be served at a facility near New York City to facilitate visits with her family and consultation with counsel regarding her appeal.

## DISCUSSION

### I. Statutory Penalties

Jasper was convicted of a single count of embezzling funds in excess of $1000 from the Credit Union from 1997 through May 15, 2000 in violation of 18 U.S.C. § 637. Where the amount embezzled exceeds $1000, section 637 authorizes a sentence of up to thirty years and a fine up to $1,000,000. In addition, pursuant to 18 U.S.C. § 3583(b)(1), if the Court orders a term of imprisonment, it may further order a term of supervised release of up to five years. Full restitution of the loss that directly and proximately results from the offense conduct is required under 18 U.S.C. §§ 3663A and 3664, as is a special assessment of $100 under 18 U.S.C. § 3013.

### II. The Guidelines

Of course, the Court's discretion in sentencing matters is largely constrained by the Sentencing Guidelines, and, not surprisingly, that is where the action is in terms of determining an appropriate sen-

tence for the defendant.[1] Ordinarily, the Guidelines in effect at the time of sentencing apply; however, where the Guidelines in effect at the time the offense is committed are more favorable to the defendant, courts apply the version in effect at the time of the offense conduct. *See* U.S. Sentencing Guidelines Manual § 1B1.11(b)(1) (2002) (hereinafter "U.S.S.G."); *United States v. Fitzgerald,* 232 F.3d 315, 318 (2d Cir.2000). In such cases, if the defendant is convicted for an offense that occurred over a period of time, the last date on which the conduct occurred determines the applicable version of the Guidelines. *See* U.S.S.G. § 1B1.11, cmt. n. 2; *Fitzgerald,* 232 F.3d at 318–19. Here, because the 1998 version of the Guidelines in effect at the time Jasper committed her offense is more favorable to the defendant than the current version, the 1998 version of the Guidelines governs her sentence.

## II.A. OFFENSE LEVEL

■ Under the 1998 Guidelines, the base offense level for embezzlement in violation of 18 U.S.C. § 657 is four. U.S.S.G. § 2B1.1(a) (1998). The government seeks a twelve-level increase to the offense level

because the offense conduct, including relevant conduct, caused a total loss in excess of $500,000, *see id.* § 2B1.1(b)(1)(M); a two-level increase because the offense involved more than minimal planning, *see id.* § 2B1.1(b)(4)(A); a two-level increase because the defendant abused a position of private trust, *see id.* § 3B1.3(b); and a two-level increase because the defendant attempted to obstruct justice by committing perjury during her trial, *see id.* § 3C1.1. The defendant disputes each of these determinations.

■ As an initial matter, there is no need for an evidentiary hearing to determine any of these issues. The type of procedure necessary to resolve disputed sentencing issues, including the need for a full-blown evidentiary hearing, is entrusted to the district court's discretion. *United States v. Slevin,* 106 F.3d 1086, 1091 (2d Cir.1996). The government, the probation office, and the defendant rely on evidence introduced at trial in making their respective arguments. The government further submits that the sentencing determination can be made based on the existing record, (*see* Letter from Daniel A. Braun, Esq. to Hon. Peter K. Leisure of 10/3/03 at 2

---

1. Of course, the Court is mindful of its discretion to depart under special circumstances, as discussed below. *See generally,* U.S.S.G. ch. 1, pt. A, cmt. 4(b), § 5K2.0; *Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (clarifying the analytical framework and scope of the district court's discretion in departing from the sentencing range proscribed by the Guidelines); *United States v. Silleg,* 311 F.3d 557, 561 (2d Cir. 2002) ("Although we usually presume that the district court understands the extent of its sentencing authority, we have held that this presumption can be overcome where the record provides a reviewing court with clear evidence of a substantial risk that the judge misapprehended the scope of his departure authority.") (internal quotations and citations omitted); *United States v. Brown,* 98 F.3d 690, 693 (2d Cir.1996) ("When a sentencing

judge asserts that he has no authority to depart, or when he says he wishes he could impose a sentence outside the calculated Guidelines range but is constrained by the Guidelines from doing so, we do not infer that he is saying that the Guidelines never permit departure (for that is obviously untrue) but *that the facts of the case at hand do not provide any basis for lawful departure.*") (emphasis in original). *But see* Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003, Pub.L. No. 108–21, § 401(m), 117 Stat. 650, 667–676 (2003) *and* Sentencing Guidelines for United States Courts; Notice, 68 Fed.Reg. 60154 (Oct. 21, 2003) (further restricting district courts' discretion to grant departures in circumstances not relevant to this case and expanding appellate review of district courts' departure decisions).

("Gov't Response")), while the defendant has not indicated any new evidence that she would introduce in such a hearing. Therefore, the Court will determine Jasper's sentence based on the trial record, the parties' respective sentencing submissions, and their arguments at the sentencing hearing.

*II.A.1. Total Loss*

The probation office recommends that Jasper's offense level be calculated based on a total loss of $616,700. (PSI ¶ 26.) This recommendation is based on a finding that 1) the defendant embezzled $433,615 during the period from September 1997 through May 15, 2000–a period covered by the indictment, and 2) additional losses of $183,085 connected to ATM replenishments prior to September 1997 should be imputed to the defendant as relevant conduct. (*Id.* ¶¶ 7, 13, 17.) The defendant argues that the evidence at trial only proves a loss of less than $120,000, although she recognizes that $433,615 "more closely approaches a legally supportable loss total." (Letter from Roger B. Adler, Esq. to Hon. Peter K. Leisure of 9/22/03 at 2) ("Def. Letter Brief").[2] The government supports the recommendation of the probation office, emphasizing that the Court must only make a reasonable estimate of the total loss for purposes of calculating the offense level. (Gov't Response at 2.)

In calculating the appropriate offense level for crimes of embezzlement, the Court is not limited to considering losses proved at trial or occurring during the

period covered by the indictment. Rather, the Court may consider losses resulting from acts and omissions that are "part of the same course of conduct or common scheme or plan as the offense of conviction" as relevant conduct. U.S.S.G. § 1B1.3(a)(2); *see also United States v. Silkowski*, 32 F.3d 682, 688 (2d Cir.1994) ("Indeed, the consideration at sentencing of criminal acts not within the offense of conviction, far from being a unique product of the Guidelines, has been an established component of the district court's sentencing discretion long before the enactment of section 1B1.3(a)(2)."). Moreover, the determination of total loss resulting from embezzlement "need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2B1.1, cmt. n. 3. "This estimate ... may be based upon the approximate number of victims and the average loss to each victim, or on more general factors, such as the scope and duration of the offense." *Id.*

Facts in support of sentencing factors, such as relevant conduct, generally must be established by a preponderance of the evidence. *See* U.S.S.G. § 6A1.3, cmt.; *United States v. Sutton*, 13 F.3d 595, 599 (2d Cir.1994) ("Facts in support of a sentencing calculation need only be proven by a preponderance of the evidence, and the district court's findings will not be disturbed unless clearly erroneous." (quoting *United States v. Beverly*, 5 F.3d 633, 642 (2d Cir.1993))).[3] In making this determi-

---

**2.** In fact, the defendant concedes in her reply to the government's response that $433,615 is an "adequate and reliable" basis for determining her offense level. (Letter from Roger B. Adler, Esq. to Hon. Peter K. Leisure of 10/20/03 at 1 ("Def.Reply").)

**3.** There is precedent, however, suggesting that where relevant conduct is the basis for a much heavier sentence, such conduct must be

established by a more stringent evidentiary standard. *Compare United States v. Shonubi*, 103 F.3d 1085, 1089 (2d Cir.1997) (Newman, C.J.) ("[T]hough the Sentencing Commission has favored the preponderance-of-the-evidence standard for resolving all disputed facts at sentencing, ... we have ruled that a more rigorous standard should be used in determining disputed aspects of relevant conduct where such conduct, if proven, will signifi-

nation, "[t]he sentencing court's discretion is 'largely unlimited either as to the kind of information [it] may consider, or the source from which [the information] may come.'" *United States v. Sisti*, 91 F.3d 305, 312 (2d Cir.1996) (citations omitted.).

The government and the probation office argue that Jasper's sentence should be calculated based on a total loss of $616,700. This amount includes $433,615 that the Credit Union determined was taken from the Secretariate Branch ATMs by Jasper from September 1997 through May 15, 2000. It also includes an additional $183,085 that the Credit Union determined was missing from its ATM accounts, which the government now contends Jasper must have stolen before September 1997. The $433,615 loss is clearly supported on the record by the testimony of Mr. Fenimore and documents relating to his investigation, which show that Jasper under-reported the amount of money she took from the ATM on over 200 occasions by over $400,000. The Court has little trouble finding, and the Defendant does not seriously dispute, that the $433,615 should be included in a "reasonable estimate" of the total loss.

The additional $183,085 loss is more problematic. The government and the probation office submit that this amount should be included in the total loss because 1) Jasper was shown to have embezzled over $400,000 between September 1997 and May 15, 2000, 2) the Credit Union was missing $616,700 from its ATM accounts, 3) Jasper was the branch manager of the Secretariate Branch for several years prior to 1997 and had access to its ATMs, 4)

there is no other plausible explanation for the missing funds, and 5) the Credit Union's insurance company paid a claim based on the total loss. The defendant, on the other hand, argues that no testimony at trial supports attributing the additional loss to Jasper and that the shoddy record keeping of the Credit Union should preclude an increase in sentence based on this loss. The Court does not find that the additional $183,085, or any portion thereof, should be included in a reasonable estimate of the total loss resulting from Jasper's criminal conduct.

It is true, as the government urges, that the Court has a wide range of discretion in determining a reasonable estimate of total loss. Where the government has shown criminal conduct, the Court may estimate the loss based on any number of factors. For example, in *United States v. Germosen*, 139 F.3d 120 (2d Cir.1998), the defendant, a travel agent, was convicted of conspiracy to commit wire fraud for his role in a number of "bust out" schemes: fraudulent schemes where travel agents sell a high volume of discount airplane tickets but never remit any payment to the airlines. The Court of Appeals upheld the district court's decision to base its determination of total loss on estimates by the defendant's co-conspirators of his proportionate share of the sales from several bust outs and to further hold the defendant responsible for the entire loss resulting from a bust out for which the district court found him particularly culpable. *Id.* at 129–130. This discretion extends to determining additional loss resulting from rele-

cantly enhance a sentence."), *with United States v. Cordoba–Murgas*, 233 F.3d 704, 708–709 (2d Cir.2000) (Murtha, J.) (holding that *Shonubi* did not authorize a higher standard for proving disputed sentencing facts, but rather served as a warning that where relevant conduct proved by a preponderance of

the evidence results in a large upward adjustment, the district court should be wary of imposing a sentence that is excessive, inappropriate and unintended under the Guidelines.). Such considerations are not applicable here.

vant conduct established by a preponderance of the evidence. *United States v. Martin,* 157 F.3d 46, 49–50 (2d Cir.1998) (upholding district court's inclusion of additional $60,000 in loss total for stolen parts possessed by defendant where defendant had only been charged and convicted of transporting $28,900 worth of stolen parts).

Here, any additional ATM thefts by Jasper before the period covered by the indictment would most likely qualify as relevant conduct; however, the government has not made an adequate showing that Jasper engaged in additional thefts. At trial, the government produced compelling evidence that Jasper siphoned funds from the ATMs during the period from September 1997 through May 15, 2000: most importantly, the investigation by Fenimore that showed that Jasper under reported over $400,000 while performing ATM replenishments during this period. There is a dearth of such evidence as to Jasper's conduct before this period.[4]

The government would now have the Court infer that Jasper committed additional thefts based largely on the fact that additional money is missing from the Credit Union's accounts. While courts often make reasonable estimates of loss based on relevant conduct that has been established by a preponderance of the evidence, here, in essence, the government is asking the Court to infer additional relevant conduct based on the existence of a loss. While the determination of sentencing factors is a fact-intensive undertaking, and case law should be applied with caution, *see United States v. Jacobs,* 117 F.3d 82, 95 (2d Cir.1997), it is telling that none of the cases cited by the government involve a similar inference. *Cf., e.g., id.* at 98 (where defendant was convicted of con-

spiracy and bank and mail fraud, upholding district court's determination of total loss to include face value of worthless certified drafts issued by defendant as intended loss even though it was unlikely that any bank would have discharged debts based on receipt of such instruments); *United States v. Reese,* 33 F.3d 166, 174 (upholding determination of total loss based on losses from fraudulent loans processed by defendant that had been foreclosed or were in the process of foreclosure). Attributing the additional loss to conduct by Jasper is further discouraged by the paucity of pre–1997 records and testimony at trial indicating that the Credit Union had several instances of unrelated thefts and cash accounting problems during the relevant time period.

Having reviewed the trial transcript and evidence and the post-trial submissions of the parties, and having heard from the parties at the sentencing hearing, the Court finds that the government has not established additional thefts by Jasper prior to September 1997 by a preponderance of the evidence and declines to include any of the additional $183,085 in the total loss. Accordingly, the Court finds that $433,615 is a reasonable estimate of the total loss, resulting in an eleven point increase in the defendant's offense level. U.S.S.G. § 2B1.1(b)(1)(L).

### II.A.2. More Than Minimal Planning

██ The probation office and the government seek a two-level increase in Jasper's offense level because her offense conduct involved "more than minimal planning." U.S.S.G. § 2B1.1(b)(4)(A). The defendant, on the other hand, argues that her offense has "all the telltale signs of [a crime] of opportunity," and that there is

---

4. As the government puts it: "[N]either the Credit Union nor the Government can determine when the defendant began embezzling funds from the ATMs." (Gov't Response at 4.)

insufficient proof of more than minimal planning. (Def. Letter Brief at 3.) The Court finds that Jasper's conduct did involve more than minimal planning and that the two-level increase applies.

The guidelines define "more than minimal planning" as follows,

"More than minimal planning" means more planning than is typical for commission of the offense in a simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense, other than conduct to which § 3C1.1 (Obstructing or Impeding the Administration of Justice) applies.

"More than minimal planning" is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune. Consequently, this adjustment will apply especially frequently in property offenses.

U.S.S.G. § 1B1.1, cmt. n. 1(f). The defendant's conduct clearly meets this standard.

Convincing evidence was introduced at trial showing that 1) the defendant's embezzlement of funds occurred over a period from September 1997 through May 15, 2000; 2) the defendant embezzled funds on more than 200 occasions; 3) the defendant failed to properly document the amount of cash she withdrew from the Secretariate ATMs and did not include computer receipts, which would have shown the discrepancy, in her records of the replenishment; and 4) the defendant bypassed the dual control policy and arranged to perform key stages of the ATM replenishments by herself in order to conceal her crime.

The Court finds that the government has met its burden of establishing these facts by a preponderance of the evidence. Under these circumstances, it strains credulity to interpret Jasper's conduct as a series of "opportunities taken." (Def. Letter Brief at 3 n. 1.) Rather, the evidence shows that Jasper engaged in substantially more than minimal planning in carrying out her offense. *Compare United States v. Allen,* 201 F.3d 163, 167 (2d Cir.2000) (finding more than minimal planning where defendant had written personal checks on the company account, issued unauthorized payroll checks to herself, and used a company credit card for personal expenses on numerous occasions over three years of employment and had taken steps to conceal her fraud), *and United States v. Barrett,* 178 F.3d 643, 649 (2d Cir.1999) (finding more than minimal planning where defendant repeatedly created false invoices over six years to accomplish embezzlement and noting that "even if his crime was not complex, [defendant] took 'detailed and deliberate action' in committing the offense" (quoting *United States v. Walsh,* 119 F.3d 115, 120 (2d Cir.1997))), *and United States v. Kim,* 23 F.3d 513, 515 (D.C.Cir.1994) ("We ... agree with the Seventh and Tenth Circuits that 'repeated acts' in the description of more than minimal planning contemplates at least three acts."), *with United States v. Cropper,* 42 F.3d 755, 759 (2d Cir.1994) (McLaughlin, J.) (finding that defendant's theft from a warehouse did not involve more than minimal planning but rather suggested a "spontaneous, reckless caper" similar to "a Monet impressionist rendering, fashioned as the thoughts occurred to him"). Therefore, the Court will apply a two-level increase to Jasper's offense level.

### II.A.3. Abuse of Position of Trust

■ The government and the probation office also recommend that the Court increase Jasper's offense level by two levels because, in committing her offense, she abused a position of private trust. *See* U.S.S.G. § 3B1.3. The government argues

that the two-level increase should apply because Jasper used her position as supervisor of the Credit Union Secretariate Branch to facilitate her crime and evade detection. The defendant argues that the increase should not apply because Jasper's role in performing ATM replenishments was more akin to that of an ordinary teller. The Court agrees with the government.

Under the Guidelines,

"Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.* substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily nondiscretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.* by making the detection of the offense or the defendant's responsibility for the offense more difficult).... This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

*Id.*, cmt. n. 1. "'[T]he primary trait that distinguishes' a position of trust from other positions is 'the extent to which the position provides the freedom to commit a difficult-to-detect wrong.'" *United States v. Laljie*, 184 F.3d 180, 194 (2d Cir.1999) (quoting *United States v. Viola*, 35 F.3d 37, 45 (2d Cir.1994)). "Whether a given position is one of trust within the meaning of § 3B1.3 is to be viewed from the perspective of the [victim]." *Id.* at 195.

It is undisputed that Jasper was in charge of the day-to-day operation of the Secretariate Branch. Indeed, Jasper herself testified that she was entrusted by the Credit Union with overseeing all aspects of the branch operation:

As branch manager, my duties included supervising the staff, which is the tellers, member service reps, performing evaluations, taking part in interviews of prospective employees, ing [sic.] teller duties, attending managers' meetings, attending seminars out of state, coaching the staff, reprimanding the staff, ing [sic.] monthly cash count, reporting to upper management, and overall ensuring that the branch is functioning properly.

(Trial Transcript at 769–70 (hereinafter, "Tr.")). Evidence at trial showed that these duties included ensuring that Credit Union employees followed the proper ATM replenishment procedure and reporting any discrepancies in the ATM cash count.

This position enabled Jasper to commit and to conceal her embezzlement from the ATMs. She assigned herself to perform ATM replenishments and instructed tellers who were assigned to perform the dual control role in the replenishments to go back to their teller duties, leaving her alone with the cash and records. Having disposed of any potential witnesses, she was able to pocket cash, under-report the amount taken from the ATM, and omit the computerized receipts that would have shown the discrepancy from her replenishment report. Further, since she was responsible for monitoring branch operations, including any irregularities in the replenishment process, there was no one to alert upper management to the problem. The buck stopped with Jasper.

Contrary to defendant's assertion, her position as a branch manager is readily distinguished from that of an ordinary teller. Jasper had significant discretion in carrying out her managerial responsibilities and was not subject to the tight super-

visory controls that are placed on tellers. *Cf. United States v. Melendez,* 41 F.3d 797, 799 (2d Cir.1994) (finding that postal worker who stole funds had abused position of trust and distinguishing worker from a bank teller who "receives a precise sum of money at the beginning of each day for which that teller must account penny-for-penny at day's end"). Not surprisingly, most courts have found that the enhancement should apply to employees in similar positions. *See, e.g., United States v. Chanthaseng,* 274 F.3d 586, 589–90 (1st Cir. 2001); *United States v. Anderson,* 259 F.3d 853, 862–63 (7th Cir.2001); *United States v. Zaragoza,* 123 F.3d 472, 482 (7th Cir.1997); *United States v. McMillen,* 917 F.2d 773, 775–76 (3d Cir.1990). *But cf. United States v. Humphrey,* 279 F.3d 372, 381 (6th Cir.2002) (overruling application of enhancement to vault teller who had stolen money from the bank and evaded security procedures on the grounds that the teller's trust relationship with the bank did not rise to that of a fiduciary). The Credit Union trusted Jasper to run the Secretariate Branch and to ensure that its employees followed its policies and security procedures; Jasper used that position to steal money and hide the loss for almost three years.

Under these circumstances, viewed in light of precedent in this Circuit, Jasper held a position of private trust. The enhancement does not only apply to "big shot[s]," *United States v. Allen,* 201 F.3d 163, 166 (2d Cir.2000) (applying enhancement to an office manager), or fiduciaries, *United States v. Barrett,* 178 F.3d 643, 646 (2d Cir.1999) (noting that the enhancement has been applied to police officers, security guards, babysitters, custodians, and truck drivers). It applies to all cases, such as this one, where the defendant's position of trust provides the freedom to commit a wrong and the means to conceal it. The Court will add two levels to Jasper's offense level due to her abuse of a position of private trust.

### II.A.4. Obstructing the Administration of Justice

Based on allegedly false testimony by Jasper at trial, the government requests a two-level increase to Jasper's offense level for obstruction of justice. The probation office, in keeping with its policy where the alleged obstruction is based on false statements at trial, declines to make a recommendation on whether such an enhancement should apply. (PSI ¶ 30.) Defendant disputes the enhancement, arguing that, in light of the circumstantial nature of the case, her testimony reflected her best recollection of her conduct, it was not contradicted in a material way and it was tantamount to a general not-guilty plea that should not be treated as obstruction.

The Guidelines provide for a two-level enhancement for obstruction of justice where "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction," provided "the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense...." U.S.S.G. § 3C1.1. This includes "committing, suborning or attempting to suborn perjury." *Id.* § 3C1.1, cmt. n. 4(b). The Guidelines warn, however,

> This provision is not intended to punish a defendant for the exercise of a constitutional right ... in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake or faulty memory and, thus, not all inaccurate testimony or statements

necessarily reflect a willful attempt to obstruct justice.

*Id.* § 3C1.1, cmt. n. 2.

In the Second Circuit,

> an enhancement for obstruction of justice based on perjured testimony may be imposed only where the sentencing court finds 'that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter.' Perjury is committed 'willfully' where it is made with 'the specific purpose of obstructing justice,' and 'materially' where it is material to the proceedings in which it is given.

*United States v. Ben–Shimon,* 249 F.3d 98, 102 (2d Cir.2001) (quoting *United States v. Zagari,* 111 F.3d 307, 329 (2d Cir.1997)); *accord United States v. Dunnigan,* 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993) (holding that, in order to enhance sentence on the basis of perjury, sentencing court must find that defendant gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory"). The Second Circuit has further emphasized the importance of finding the specific intent or *mens rea* to obstruct justice. *See United States v. Case,* 180 F.3d 464, 467 (2d Cir.1999); *United States v. Kelly,* 147 F.3d 172, 178 (2d Cir.1998).

■ As an initial matter, the parties disagree as to the proper evidentiary standard that applies to the Court's factual determinations under this section. The probation office and the defendant have assumed that the Court must find the foregoing factors under a clear-and-convincing standard. The government, however, correctly points out that the application of the clear-and-convincing standard in this Circuit was based on an Application Note to the Guidelines cautioning the sentencing

court that "[testimony or statements by the defendant] should be evaluated in a light most favorable to the defendant." *See, e.g., United States v. Ruggiero,* 100 F.3d 284, 294 (2d Cir.1996) (quoting a pre–1997 version of U.S.S.G. § 3C1.1, cmt. n. 1). That Application Note, however, was deleted in November of 1997. U.S.S.G.App. C, Amend. 566 (Nov. 1, 1997). As a result, the government argues, a preponderance-of-the-evidence standard should now apply. (*See* Gov't Resp. at 12 n. 2 (citing *United States v. Menting,* 166 F.3d 923, 929 (7th Cir.1999) and *United States v. Greer,* 285 F.3d 158, 182–83 (2d Cir.2002)).)

The case for the preponderance-of-the-evidence test is not as open and shut as the government suggests. The Second Circuit case cited by the government did not overrule, and made no mention of, the clear-and-convincing standard; rather, it found that as a result of Amendment 566 the sentencing court should not have construed the defendant's statements "in the light most favorable to the defendants." *See Greer,* 285 F.3d at 182–83. The case from the Seventh Circuit is not much more helpful. *Menting* did apply a preponderance-of-the-evidence standard, but did not rely on Amendment 566. 166 F.3d at 929. It didn't need to, as the Seventh Circuit already applied the preponderance-of-the-evidence test under the pre–1997 Guidelines that included the pro-defendant Note. *See, e.g., United States v. Godinez,* 110 F.3d 448, 456 (7th Cir. March 27, 1997).

Furthermore, the clear-and-convincing standard has continued to appear in decisions of the Second Circuit and Southern District courts even in cases applying post–1997 versions of § 3C1.1. *See, e.g., United States v. Louis,* 63 Fed. Appx. 29, 31, 2003 WL 21105323 (2d Cir.2003) (unreported summary order); *United States v. Grimes,* 225 F.3d 254, 260 (2d Cir.2000);

*United States v. Briceno,* 2003 WL 22025870 at \*5 (S.D.N.Y.2003). The question is an important one because the threat of a perjury enhancement has the potential to undermine the defendant's constitutional right to testify on her own behalf. *See Rock v. Arkansas,* 483 U.S. 44, 51–53, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). As the D.C. Circuit observed in holding that a heightened standard applied to perjury enhancements under the pre–1997 Guidelines, the clear-and-convincing standard provides an additional safeguard to that right. *See United States v. Montague,* 40 F.3d 1251, 1254 n. 1 (D.C.Cir.1994).

That said, there is precedent in this Circuit applying the preponderance-of-the-evidence standard to § 3C1.1 enhancements for perjury. *See United States v. Ben–Shimon,* 249 F.3d 98, 102 (2d Cir. 2001). In addition, the Sentencing Commission, in amending the Application Note to § 3C1.1 made clear that it intended for courts to apply the preponderance-of-the-evidence standard: "The amendment changes the last sentence of Application Note 1 so that it no longer suggests the use of a heightened standard of proof." U.S.S.G.App. C, Amend. 566 (Nov. 1, 1997). In place of the heightened standard, the Commission added the warning that "courts should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." *Id.*

Most importantly, the Supreme Court's decisions on the constitutionality of applying an enhanced sentence based on perjury at trial do not suggest that the sentencing court is obligated to apply a heightened burden of proof beyond the traditional preponderance-of-the-evidence test. *See generally United States v. Dunnigan,* 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993); *United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978). Instead, the Court has emphasized that requiring the sentencing court to find the specific elements of perjury and the willful intent to obstruct justice provide adequate protections for the defendant's right to testify.

For example, in *Grayson* the Court found that the defendant's willingness to perjure himself was probative of his character and potential for rehabilitation, and thus an appropriate factor for the judge to consider in determining a sentence. 438 U.S. at 53–54, 98 S.Ct. 2610. Emphasizing that there is no constitutional right to give perjured testimony, the Court found that the defendant's right to give truthful testimony would be adequately protected by the careful evaluation of the testimony, keeping in mind the possibility of mistake and all other sentencing factors known to the judge, to determine whether the testimony is willfully and materially false. *Id.* at 55, 98 S.Ct. 2610 ("[W]e are reaffirming the authority of a sentencing judge to evaluate carefully a defendant's testimony on the stand, determine–with a consciousness of the frailty of human judgment–whether that testimony contained willful and material falsehoods, and, if so, assess in light of all the other knowledge gained about the defendant the meaning of that conduct with respect to his prospects for rehabilitation and restoration to a useful place in society.").

Of course, the roles of rehabilitation and a judge's evaluation of the defendant's character have been greatly reduced by the Sentencing Guidelines. In *Dunnigan,* however, the Court made clear that the Guideline enhancement for perjury was a permissible means for the government to further its legitimate goals of retribution and incapacitation relating to the principal crime. 507 U.S. at 97–98, 113 S.Ct. 1111

("It is rational for a sentencing authority to conclude that a defendant who commits a crime and then perjures herself in an unlawful attempt to avoid responsibility is more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process."). Importantly, the Court found that the need to protect the defendant's right to testify would be served by requiring the sentencing judge to find that the defendant had willfully committed perjury with the intent to obstruct justice. *Id.* at 95–97, 113 S.Ct. 1111. It did not, however, suggest that a heightened standard of proof would apply to these findings. Accordingly, this Court will apply a preponderance-of-the-evidence test in evaluating whether Jasper's sentence should be enhanced for perjury.

Reluctantly, the Court finds that an enhancement for obstruction of justice is required under the Guidelines in this case. Jasper gave false testimony on a number of issues. She testified that she followed Credit Union procedures when replenishing the ATMs and returning unused cash to the vault and that if she had encountered any discrepancies in the cash count she would have documented the shortfall and reported it to her supervisor as well as the accounting department. (Tr. 785–86, 792–94.) The clear weight of the evidence at trial, however, showed that Jasper took cash for herself from the ATM, made false entries to bank records, omitted crucial receipts from her reports, and failed to report these discrepancies in an effort to cover her tracks. Jasper's testimony was clearly false and clearly material, for if her testimony were credible, it would tend to show that she did not embezzle the funds.

Jasper also testified that the Credit Union's dual control procedures for replenishing the ATMs were always followed and that she never instructed any of her subordinates at the Credit Union to return to other duties while they were supposed to be assisting her with the ATM replenishments. (Tr. 777–78, 851–53.) This testimony was contradicted by two witnesses from the Credit Union who testified that the dual control procedures were often not followed. One teller further testified that Jasper sometimes instructed the teller assigned to ATM replenishment to go back to her teller work, leaving Jasper alone to count the cash that had been removed from the ATM and complete the required paperwork. (Tr. 531–33, 601–603.) The tellers' testimony was consistent with the videotape introduced by the government showing Jasper counting cash removed from the ATM by herself, and apparently putting it in her handbag, contrary to the dual control procedures. The Court finds that Jasper's testimony was false. It was also material because, if believed, it would tend to show that Jasper did not have the opportunity to embezzle money from the ATM without being observed.

The defendant attempted to explain the videotape by testifying that it showed her placing cash into her cash box on May 15, 2000, rather than into her handbag. The tape is certainly not of the highest quality, however, it is reasonably clear from the tape that Jasper is putting the money in her bag. Furthermore, the government introduced evidence and testimony at trial showing that $2000 removed from the ATM on that day was missing and Jasper on cross-examination acknowledged, if she had put the money in her cash box, it would have shown up in the Credit Union's records. (Tr. 868–70.) The weight of the evidence shows that Jasper's explanation of the tape was false. Obviously, it was also material.[5]

5. The government also argues that the defen-

dant perjured herself in stating that she held a

Finally, the defendant repeatedly denied that she had ever stolen money from the Credit Union. The jury necessarily found these denials to be false, beyond a reasonable doubt, and the Court does not disagree. Defendant is right to point out that a general denial of guilt on its own is not an appropriate basis for a sentencing enhancement. However, Jasper did not stop at merely denying her culpability. Instead, as detailed above, she compounded the lie by giving significant false testimony on facts crucial to the determination of her guilt or innocence. In light of this, it would be irrational to conclude that Jasper's false testimony was the result of confusion, mistake or faulty memory. Thus, the Court finds that Jasper intentionally gave false testimony to material facts for the specific purpose of obstructing justice.

The Court notes that it is applying an enhancement here solely because it is required by the Guidelines. The Court was impressed by the character witnesses who testified on behalf of the defendant and the personal history compiled by the probation office. The defendant appears to be a hardworking and well-respected member of her community, although, as this case has shown, her character is not without flaws. In light of its extensive knowledge of the case and the defendant's background, the Court would not have enhanced the defendant's sentence for perjury if not for the Guidelines. The defendant's perjury in this case does not

provide significant insight regarding her potential for rehabilitation or the degree of retribution and incapacitation warranted by her crime. The Guidelines demand their pound of flesh, however, and the sentencing court cannot ignore them.[6] A two-level increase for obstruction of justice will be applied to Jasper's offense level.

### II.A.5. Downward Departure Based on Medical Condition

■ The defendant has requested a downward departure from her sentence based on a heart condition and hypertension. "Physical condition ... is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. However, an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range." U.S.S.G. § 5H1.4. The sentencing court may only grant such a departure in exceptional circumstances, *Koon v. United States*, 518 U.S. 81, 95, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), for example, where the defendant can demonstrate that she has an "extraordinary physical impairment" that cannot be effectively monitored in a Bureau of Prisons ("BOP") facility, *United States v. Altman*, 48 F.3d 96, 104 (2d Cir.1995).

The defendant has not shown that a downward departure is appropriate based on her medical condition. The probation office has determined that Jasper's condi-

---

bank account for her brother to hold and invest money for his children's education. (Gov't Resp. at 15.) The government, argues that Jasper's later testimony showed significant deposits and withdrawals for Jasper's personal use. The Court finds that while this testimony may have been misleading, it was not perjurious. It is conceivable that the account was for the purpose of investing the brother's money, but that Jasper, on occasion, used it for herself.

**6.** Although the Court questions the usefulness of the perjury enhancement in this case, it does not view the defendant's conduct as falling outside the "heartland" of cases carved out by the obstruction guideline. *See* U.S.S.G. ch. 1, pt. A, cmt. 4(b), § 5K2.0; *supra* note 1.

tion is not extraordinary and can be adequately treated by the BOP. The probation office further notes that the BOP, in fact, effectively treats prisoners with more severe and acute forms of heart disease and hypertension. (PSI at 24.) The defendant has submitted no evidence showing that her condition is extraordinary or casting doubt on the BOP's ability to treat her condition. Nor has she shown that her condition somehow renders her imprisonment wasteful or unnecessary. *Cf. United States v. Jimenez,* 212 F.Supp.2d 214, 216 (S.D.N.Y.2002) (granting downward departure where defendant suffered a brain aneurysm, which required emergency neurosurgery and left her with severe memory loss, loss of strength in her right arm, headaches, blurred vision, and psychotic hallucinations and required her to take debilitating psychotropic drugs). Therefore, the request for a downward departure is denied.

■ As a result, Jasper's offense level for sentencing purposes is 21, which, applying a Criminal History Category of I, (PSI ¶ 38), corresponds to a sentencing range of thirty-seven to forty-six months. The defendant has committed a serious crime; however, as noted above, the Court has been impressed with Jasper's character and the willingness of friends and colleagues to testify and write letters detailing their respect and affection for her. They paint a picture of a person who cares about her community and her family. The Court further believes that the defendant does not pose a high risk of recidivism. Therefore, the Court sentences the defendant to the minimum within the Guideline range: thirty-seven months.

---

7. The probation office includes this as a mandatory condition, although it is listed as a "special" condition under the Guidelines. *See* U.S.S.G. § 5D1.3(d)(1). It is, in effect,

## II.B. SUPERVISED RELEASE

The Guideline range for a term of supervised release is three to five years. U.S.S.G. § 5D1.2. The probation office has recommended the minimum term of three years under the mandatory and standard conditions, as well as a number of special conditions, authorized by U.S.S.G. § 5D1.3. (PSI at 25–26.) Neither the government nor the defendant has objected to this recommendation. The Court finds that the term and the conditions are appropriate. Therefore it imposes a three-year term of supervised release to follow the defendant's imprisonment, subject to the conditions recommended in the Presentence Investigation Report. The Court also agrees with the probation office that the defendant does not pose a risk of substance abuse and suspends the mandatory drug testing policy during supervised release. *See* 18 U.S.C. 3563(a), 3583(d).

The specific conditions that will apply to the defendant's term of supervised release are as follows.

*Mandatory Conditions*

1. The defendant shall not commit another federal, state, or local crime.

2. The defendant shall not illegally possess a controlled substance.

3. The defendant shall not possess a firearm or destructive device.[7]

*Standard Conditions*

1. The defendant shall not leave the area encompassed by the Southern and Eastern Districts of New York without the permission of the Court or probation office.

2. The defendant shall report to the probation officer as directed by the

mandatory, however, for defendants convicted of a felony. *See* 18 U.S.C. § 922(g)(1); *United States v. Asuncion–Pimental,* 290 F.3d 91, 94 (2d Cir.2002).

Court or probation officer and shall submit a truthful and complete written report within the first five days of each month.

3. The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.

4. The defendant shall support her dependants and meet other family responsibilities.

5. The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training or other acceptable reasons.

6. The defendant shall notify the probation officer at least ten days prior to any change of residence or employment.

7. The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute or administer any controlled substance or any paraphernalia related to any controlled substance, except as prescribed by a physician.

8. The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered.

9. The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.

10. The defendant shall permit a probation officer to visit her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer.

11. The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.

12. The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court.

13. As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by her criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

*Special Conditions*

1. The defendant shall make restitution at a rate of ten percent of her gross monthly income, on a monthly basis, until her imposed order of restitution is paid in full.

2. The defendant shall provide the probation officer with access to any requested financial information.

3. The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless the defendant is in compliance with the installment payment schedule.

4. The defendant shall cooperate with the Internal Revenue Service in resolving the discrepancies in her tax returns discovered during the presentence investigation.

The defendant is also directed to report to the nearest probation office within seventy-two hours of her release from custody.

## II.C. RESTITUTION

Restitution is required under the Guidelines for the full amount of the victim's loss in this case, *see* U.S.S.G. § 5E1.1, which is the total actual loss resulting from the defendant's offense conduct. *See* 18 U.S.C.S. § 3663A, cmt. (Lexis Supp. 2002); *cf. United States v. Germosen*, 139 F.3d 120, 130–31 (2d Cir.1998). The probation office has recommended that the defendant be ordered to pay $433,615 in restitution to the Clerk of the Court for disbursement to Cumis Insurance Society, Inc. ("Cumis"), the Credit Union's insurer. Although the defendant initially disputed this amount, she now agrees that it is an appropriate amount for restitution. (Def.'s Reply at 3 (referencing enclosed Letter from Richard A. Klass, Esq. to David S. Smith, Esq. of 10/16/03).) In addition, the Court has been informed that Jasper has reached a civil settlement with Cumis for $433,615. (Letter from David S. Smith, Esq. to Hon. Peter K. Leisure of 10/31/03 (including a copy of the civil settlement).) The Court finds that a restitution order of $433,615 is supported by a preponderance of the evidence.

The probation office has also performed a thorough investigation of the defendant's financial status for the purpose of determining how the restitution should be paid. The probation office recommends that the defendant make an immediate payment of $10,000, with the balance to be paid in installments of ten percent of her monthly income following her release from prison. The probation office further recommends that the defendant pay a portion of any income she earns through BOP work programs while in prison. The defendant does not challenge these recommendations, but initially offered to make an initial payment of $50,000 rather than $10,000. The civil settlement does not include a dollar amount for the initial payment, but requires that Jasper immediately turn over to Cumis all money held in her Credit Union accounts.

The Court therefore orders that the defendant make restitution payable to the Clerk of the Court for the Southern District of N.Y. for disbursement to Cumis Insurance Society, Inc. in the amount of $433,615. An initial payment of at least $10,000 shall be paid immediately. The remaining restitution balance shall be paid in monthly installments of ten percent of gross monthly income over a period of supervision to commence 30 days after the date of the defendant's release from custody. While in prison, if the defendant takes part in a BOP non-UNICOR work program, she shall pay $25 per quarter toward the balance. If she participates in BOP's UNICOR program as a grade 1–4, she shall pay fifty percent of her monthly UNICOR earnings toward the balance. *See* 28 C.F.R. § 545.11 (2003). The defendant shall further notify the United States Attorney for this district within 30 days of any change of mailing or residence address that occurs while any portion of the restitution remains unpaid.

## II.D. FINE

The Court need not impose a fine where the defendant is unable and is unlikely to become able to pay any fine. U.S.S.G. § 5E1.2(a). In light of the defendant's financial circumstances and the heavy burden of the restitution order, the probation office has recommended that no fine be imposed. The Court adopts the findings of the PSI and therefore will not impose a fine.

## III. Terms of Surrender and Prison Facility

The defendant has requested that she be allowed to voluntarily surrender to a BOP facility following the Christmas and New Year holidays. She has further requested

that the Court recommend that she serve her sentence at the Danbury Federal Prison Camp facility ("Danbury Camp"), to facilitate work on her appeal and visits by family members, and that she be allowed to attend her daughter's college graduation in the spring.

The probation office has determined that the defendant is a good candidate for self-surrender and the Court agrees. The defendant is ordered to surrender to the BOP on January 26, 2003 to begin serving her sentence. As for the facility where the defendant will serve her sentence and any temporary releases from custody, the Court's recommendations are not binding. Nonetheless, the Court has found through the course of these proceedings that the defendant's strong family ties are one of the best reasons to hope that the defendant will rebound from this unfortunate chapter in her life and return to being a honest, hard working and productive member of society. Therefore, the Court recommends that the defendant's sentence be served at the Danbury Camp and further recommends that the BOP seriously consider her as a candidate for any suitable temporary release programs (such as the furlough program authorized by 18 U.S.C. § 3622) that it administers.

## CONCLUSION

Defendant is hereby sentenced to 37 months in prison, to be followed by three years of supervised release in accordance with the terms of this order. The defendant is ordered to pay restitution of $433,615 to Cumis Insurance Society, Inc. as detailed in this order and to pay an immediate special assessment of $100 to the United States.

**SO ORDERED.**